IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 27, 2002

## JOE PHILLIP LIVINGSTON v. JENNIFER ELAINE LIVINGSTON

**Appeal from the Chancery Court for Coffee County**
**No. 00-390     John W. Rollins, Judge**

---

### No. M2001-02697-COA-R3-CV - Filed October 3, 2002

---

This is a divorce case. The trial court granted Joe Phillip Livingston ("Father") a divorce from Jennifer Elaine Livingston ("Mother") on the ground of inappropriate marital conduct and awarded primary physical custody of the parties' two minor children to Father. Mother was granted visitation rights; however, the court ordered that she "refrain from allowing the parties' children to be at the residence of [Mother's] maternal grandmother" during visitation. Mother appeals the award of custody and the granting of the divorce to Father. In addition, Mother also raises a procedural issue and questions the admission of certain evidence. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and D. MICHAEL SWINEY, J., joined.

Brenda S. Bramlett, Shelbyville, Tennessee, for the appellant, Jennifer Elaine Livingston.

Randall W. Morrison, Tullahoma, Tennessee, for the appellee, Joe Phillip Livingston.

**OPINION**

I.

The parties were married on September 9, 1995; at the time, Father was 46 years of age and Mother was 22. Two children were born to their union, Daniel Gaige (DOB: January 12, 1996) and Cortney Paige (DOB: May 7, 1998). For over 16 years, Father had owned and operated his own business in Tullahoma, selling and installing garage doors. Mother worked in Father's business, answering the telephone.

While Mother claims that the parties have had problems throughout their marriage, Father contends that their problems began in the latter part of 1998 or early 1999, when, according to

Father, Mother announced that she wanted a divorce because she was in love with a woman, Linda Short. Mother admits that she met Linda Short in an internet chatroom for lesbians and testified that she simply talked to Ms. Short about her marital problems. Mother vehemently denies that she had a romantic relationship with Ms. Short.

In early March, 2000, Mother was visiting her parents in Nashville. Late that evening, Father contacted Mother and insisted that she return to Tullahoma with the children. Mother testified that she was very upset about this, as the children were already asleep and the weather was stormy, but she acquiesced in Father's demands. While en route to Tullahoma, Mother telephoned Father utilizing her cell phone and Father recorded the majority of their conversation. On the recording, which was admitted into evidence at trial, Mother launches into an acerbic diatribe, cursing Father, making threats, raising her voice, and repeatedly emphasizing how miserable she is in her marriage. Throughout this 35-minute recording, the parties' children were in Mother's automobile. According to her, the children were asleep.

In September, 2000, Father filed for divorce on the ground of inappropriate marital conduct. Mother filed a counterclaim premised upon the same ground. Following a hearing in June, 2001, the trial court entered a judgment, in which it granted Father an absolute divorce based upon Mother's inappropriate marital conduct. With respect to custody, the trial court granted primary physical custody to Father, designating him as the "primary residential parent." The court awarded Mother visitation rights. The parties were to share time with the children, "alternating from four (4) days one week to three (3) days the following week." The court specified that once the oldest child began attending school, the visitation arrangement would be modified to accommodate the child's school schedule. The court further ordered that, during the children's visitation with Mother, she was not to allow the children to be at the residence of Mother's grandmother. Finally, the court ruled that Mother would not be required to pay child support until her visitation rights were modified. In the judgment, the court also divided the parties' marital property. From this judgment,[1] Mother appeals.

II.

There are no findings of fact in the judgment. Furthermore, there are no specific findings recited by the trial court at the conclusion of the proof. The sole comment made by the court before rendering its decision from the bench is as follows:

> Folks, the tape tells a story about this. I don't really care about [Mother's] sexual preferences, it's really none of my business what she does and what she doesn't do in her private life. That tape is pretty compelling. I think it's an indication of a young lady who is very unhappy with her marriage and looking for any reason to get out of it.

---

[1]The judgment of divorce was later modified in ways that are not material to the issues on this appeal.

Generally speaking, in a divorce proceeding at a bench trial, our review is *de novo* upon the record of the proceedings below, accompanied by a presumption of correctness as to the trial court's factual findings that we must honor "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *see also* **Hass v. Knighton**, 676 S.W.2d 554, 555 (Tenn. 1984). However, in the instant case, "our ability to attach the presumption of correctness to the trial court's decision has been hampered by the absence of any findings of fact and conclusions of law by the trial judge or any other explanation of the rationale used to achieve the final result." **Kelly v. Kelly**, 679 S.W.2d 458, 460 (Tenn. Ct. App. 1984). As there are no findings of fact to which the presumption of correctness can attach, we must "conduct our own independent review of the record to *determine where the preponderance of the evidence lies*," **Crabtree v. Crabtree**, 16 S.W.3d 356, 360 (Tenn. 2000) (emphasis added) (citing **Brooks v. Brooks**, 992 S.W.2d 403, 405 (Tenn. 1999)).

### III.

Mother argues that the trial court erred in failing to properly consider the best interest of the children in awarding custody to Father. Mother contends that the factors set forth in T.C.A. § 36-6-106 (2001), which, both sides agree, must be considered in determining the custody of children, "clearly favor an award of custody to Mother." In the alternative, Mother contends that even if the trial court applied the best interest standard, the evidence preponderates against the award of custody to Father.

T.C.A. § 36-6-106 provides, in pertinent part, as follows:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the child. The court shall consider all relevant factors including the following where applicable:
>
> (1) The love, affection and emotional ties existing between the parents and child;
>
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
>
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; ....
>
> (4) The stability of the family unit of the parents;
>
> (5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; ....

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

The testimony in the record relating to the love, affection and emotional ties between each parent and the children is conflicting. Both parents testified as to the love she/he possesses for the children, and both parents testified that the children - at one time or another - had demonstrated a lack of affection for the other parent. *See* T.C.A. § 36-6-106(a)(1). While it is clear from the record that Mother has been the children's primary caregiver, the testimony reveals that both parents provided the children with food, clothing, and other necessary care. While Mother has obtained a higher level of education than Father, there is nothing in the record to indicate that Father would not assist the children in receiving a proper education. *See* T.C.A. § 36-6-106(a)(2).

With respect to the stability and continuity of the children's environment, the children continue to live in Tullahoma, where they have resided since birth. Following the divorce,[2] Mother returned to Nashville and moved into her parents' home. At the time of the divorce, the parties were alternating custody of the children on a four-day/three-day per week arrangement. Pursuant to the trial court's judgment, once the parties' oldest child began attending school in Tullahoma, the court revisited the previous custody arrangement. At that time, custody was modified to reflect that Mother would have visitation with the children every other weekend and, on the weeks that Mother did not have weekend visitation, she would have the children on Wednesday evening. The trial court additionally ordered that the parties would alternate and/or evenly divide holidays and school vacations. From all indications, the children have lived in "a stable, satisfactory environment" in the home in Tullahoma.

---

[2] Prior to this matter reaching us, there were post-divorce judgment proceedings leading to the modifications alluded to in footnote 1 to this opinion.

Both parents have numerous family members living in the vicinity of their respective homes. The trial testimony reveals that Father's children from a previous marriage, as well as his sister, reside in Tullahoma or the surrounding area. Mother's parents and other extended family members live in Nashville. *See* T.C.A. § 36-6-106(a)(4).

As to the mental and physical health of the parties, there is evidence in the record that Father takes medication to control both high blood pressure and seizures. However, Father's uncontroverted testimony reveals that he has not suffered a seizure in 13 years. Further, there was no testimony elicited that Father was in poor health or that his health condition would in any way impact his ability to care for the children. There was no testimony with respect to Mother's mental health; the recorded telephone conversation, however, clearly portrays an individual consumed with hatred and anger. *See* T.C.A. § 36-6-106(a)(5).

While the parties' oldest child is now attending school, there is no evidence in the record relating to his school record. *See* T.C.A. § 36-6-106(a)(6). Because neither of the children is over the age of 12 and because the parties apparently did not request that the trial court hear the preferences of the children, the factor set forth in T.C.A. § 36-6-106(a)(7) is not applicable to the facts of this case.

While there is no evidence of physical or emotional abuse of the children, there is testimony in the record relating to the physical and emotional abuse of each parent at the hands of the other parent. Mother testified that she had a criminal warrant issued against Father for hitting her, though Father denied this charge. On the recording of Mother's telephone conversation with Father, Mother stated as follows:

> Yeah, I've enjoyed f------ hitting you. I want to f------ hurt you. I care less if I hurt your arm or not. I hope your f------ arm hurts. I want to come over there and hit you some more tonight. Go up there and just beat the f--- out of you. Take a f------ bat and beat your f------ head off, because you deserve it.

At trial, Mother claimed that she was referring to "wrestl[ing] around and play[ing]" and that she had "never hit [Father] in anger." However, after listening to the tape recording, we cannot construe Mother's statements to reflect any sort of playfulness. With respect to emotional abuse, there is testimony in the record that both parties engaged in name-calling, though Mother's penchant for name-calling was particularly evident on the tape recording. In the taped conversation that lasted for around 35 minutes, Mother managed to use the f-word or some derivative of that word approximately 170 times, while her children were supposedly asleep in the backseat of her automobile. While Father offered no proof to dispute Mother's contention that the children were asleep throughout this entire conversation, that does not change the fact that Mother freely and loudly used this abusive language within earshot of her children, who could have woken up at any time. *See* T.C.A. § 36-6-106(a)(8).

Father has no one residing in his home aside from the children. Mother, on the other hand, resides with her parents. Father testified that his mother-in-law had once shown him a bag of marijuana that supposedly belonged to Mother's brother, and that the mother-in-law's statements concerning the drugs indicated her apparent approval. However, both Mother and her mother testified that they had never seen any marijuana or other illegal drugs in their home, nor had they ever shown any drugs to Father. *See* T.C.A. § 36-6-106(a)(9).

Finally, with respect to the parties' willingness to facilitate and encourage a close relationship between the children and the other parent, each parent testified that the other parent failed to accomplish this. Mother testified that Father told the parties' son that he did not have to mind his mother; she also testified that Father would undermine Mother's attempts to discipline the children. Father testified that Mother taught their son to kick Father between the legs and that Mother once told their son to jump on Father's stomach while Father was in bed asleep. The parties' neighbor, Sheryl Branch, testified by deposition that she had overheard Mother telling the parties' daughter "to hate men because they were no good." *See* T.C.A. § 36-6-106(a)(10).

After evaluating the proof in the record and independently reviewing the evidence presented in light of the foregoing factors, we find that the evidence preponderates in favor of an award of custody to Father. Accordingly, we find no abuse of discretion on the part of the trial court in awarding custody to Father. *See **Gaskill v. Gaskill***, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996).

IV.

Mother next contends that the trial court erred in failing to award the divorce to "either or to both parties." This issue is somewhat difficult to fathom because the court, in granting a divorce to Father, did grant a divorce to one of the parties, *i.e.*, within the concept of "either" as stated in the issue. Apparently, Mother feels that the divorce should have been granted to the parties jointly instead of to Father. *See* T.C.A. § 36-4-129 (2001). We will evaluate this issue according to what we believe Wife means.

The transcript of the proceedings below reflects that the trial court, in delivering its ruling from the bench at the conclusion of the trial, did not state which of the parties was awarded the divorce. In fact, the trial court did not mention the granting of the divorce at the conclusion of the trial. However, this is of no import. "A Court speaks only through its written judgments, duly entered upon its minutes." ***Sparkle Laundry & Cleaners, Inc. v. Kelton***, 595 S.W.2d 88, 93 (Tenn. Ct. App. 1979). In the final judgment, the divorce is awarded to father.

Further, in independently reviewing the proof in this case, we find that the evidence preponderates in favor of a finding that Father is entitled to a divorce on the ground of inappropriate marital conduct. Father testified that Mother announced to him that she wanted a divorce because she was in love with a woman and wanted to move in with that woman. There was proof that Mother and this woman, at a minimum, had an internet "relationship" in a lesbian chatroom. The parties' neighbors, Greg and Sheryl Branch, both testified that they witnessed Mother waving a

handgun toward Father while backing out of the parties' driveway in her automobile. Further, the substance of Mother's recorded telephone conversation with Father, replete with threats and cursing that would cause a sailor to blush, provides ample proof of inappropriate marital conduct on the part of Mother.

## V.

## A.

Mother next argues that the trial court erred in allowing the testimony by deposition of the parties' neighbor, Sheryl Branch. According to Mother, Ms. Branch was available to testify in person.

It appears that Ms. Branch was scheduled to undergo surgery shortly before an earlier trial setting. Because of this, the parties agreed to take her deposition for proof. Later, the trial was re-scheduled, apparently for reasons unrelated to Ms. Branch. Mother contends that Ms. Branch never had the surgery. As a result, she objected to the introduction of the deposition testimony when the case was finally heard, asserting that Ms. Branch was available to testify in person.

Tenn. R. Civ. P. 32.01 provides, in pertinent part, as follows:

> At the trial or upon the hearing of a motion ..., any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
>
> * * *
>
> (3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: ... (C) that the witness is unable to attend of testify because of age, illness, infirmity, or imprisonment; ....

In this case, it is undisputed that the parties agreed to take the deposition of Ms. Branch for proof, as they anticipated at the time of taking the deposition that Ms. Branch would be unavailable to testify in person at the trial. With respect to whether Ms. Branch was in fact unavailable at trial, we have only the unsubstantiated assertion of Mother's counsel that Ms. Branch was available. In any event, the parties agreed that the witness's testimony could be presented by deposition; accordingly, we find no abuse of discretion in the trial court's decision to receive the testimony of Ms. Branch by deposition.

B.

In addition, Mother contends that the trial court's decision to permit this witness to testify by deposition violates a local rule of the Coffee County Chancery Court, which rule provides that all depositions to be used at trial must be filed within 72 hours before the trial begins. However, in addressing the issue of local rules of court, this Court has stated:

> The Trial Court has authority to make its own rules and accordingly may waive or abolish them if it chooses. This Court will not reverse a Trial Judge for waiving a local rule absent the clearest showing of an abuse of discretion and that such waiver was the clear cause of a miscarriage of justice.

*Killinger v. Perry*, 620 S.W.2d 525, 525 (Tenn. Ct. App. 1981). As there is no showing of an abuse of discretion or miscarriage of justice in the trial court's waiver of its local rule, we find no error in the court's ruling.

C.

Finally, Mother contends that the trial court erred in allowing Father to testify concerning the number of times the Nashville Police Department had been called to the home of Mother's grandmother. Specifically, it is Mother's contention that Father based his testimony on such police reports and that such violated the hearsay rule.

During direct examination, Father was questioned about his concerns regarding the children's presence at the grandmother's[3] house. In response to these questions, Father stated that he had learned there had been 139 police calls to the grandmother's residence, whereupon Mother's counsel objected on the ground of hearsay. The trial court sustained the objection, and Father's counsel proceeded with the direct examination without any further references to these police calls. On cross-examination, Mother's counsel asked Father about his insinuation that he had "checked out something at the Metropolitan Police Department in Nashville." Father responded that he had looked at the police records for the police calls to the homes of Mother's parents and grandmother. Mother's counsel then asked to see those records. Apparently, after perusing the documents, Mother's counsel asked Father questions concerning the police calls to the residence of Mother's *parents*. Upon redirect examination, Father's counsel began to question Father about the police calls to the *grandmother's* residence. Mother's counsel again objected. Father countered that Mother's counsel "opened the door" to this testimony by specifically referring to these reports in her cross-examination of Father. The trial court stated the following:

---

[3]The person in question is Mother's maternal grandmother and the children's great-grandmother. However, for ease of reference, we will refer to her as "the grandmother."

Well, she looked at it and referred to it; there's no doubt about that. I'm not sure the document itself is admissible, but I'm going to permit you to ask.... And, I believe she asked about this grandmother's too. Go ahead.

Father then testified to the information contained in the report, which included reports of fights and assaults, gunshots being fired, and theft, among others. In its final judgment, the trial court forbade Mother from taking the children to her grandmother's residence during visitation.

Our careful review of the trial testimony reveals to us that Mother's counsel did not "open the door" to the testimony concerning police calls to the *grandmother's* residence.[4] At most, Mother's counsel reviewed the records of police calls to the grandmother's house. However, Mother's counsel at no time asked Father any questions about the calls to the grandmother's residence; her inquiries were limited to the home of Mother's parents. We therefore find that the trial court erred in allowing Father to later testify to the incidents at the grandmother's residence based upon the police reports. However, in order for this error to be reversible error, it must have "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Therefore, if there is other evidence in the record that would support the trial court's decree to keep the children away from the grandmother's residence during visitation, said error would not be reversible.

Father testified at trial that he was "concerned about the children being, at [the grandmother's] house especially, there's drug dealings going on there, there's been drive-by shootings, fights." Upon objection by Mother's counsel to lack of personal knowledge, Father testified that Mother had told of these things. Father stated that his knowledge of these incidents was separate and apart from the information he received from the Nashville Police Department.

On cross-examination, Mother's counsel and Father had the following exchange:

Q: How do you know there is drug dealing going on in [the grandmother's] home?

A: Well, I have been there and seen it. When you are at [the grandmother's] house, it's like being downtown. It's just constantly traffic. People you've never seen before coming in and out.

Q: Coming in and out of [the] grandmother's home?

A: Yes, mam.

---

[4]There is no proof in the record indicating that Mother's parents and her grandmother live in close proximity to one another.

Q:      Have you ever seen any drugs there?

A:      I've seen the boys with marihuana before.

Q:      What boys?

A:      Her cousins.

Q:      Whose cousins?

A:      [Mother's] cousins.

Q:      And you've seen them with marihuana in the home of [the] grandmother?

A:      In their – Yes, mam, in their pockets. I've never seen nobody smoke it, but I've seen them pull it out before and shake it at each other.

Based upon this testimony, we find that there was ample evidence upon which the trial court could have based its decision to keep the children away from the grandmother's home, independent of the hearsay testimony contained in the police reports. Therefore, we find and hold that the error committed by the trial court in admitting the hearsay testimony does not satisfy the requirements of Tenn. R. App. P. 36(b) and, therefore, is not reversible error.

VI.

The judgment of the trial court is affirmed. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellant, Jennifer Elaine Livingston.

_____
CHARLES D. SUSANO, JR., JUDGE