# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 23, 2004

## JAMIE EDWARD HINES v. TERRELL LYNN SIMMS

**Appeal from the Circuit Court for Davidson County**
**No. 01D-2055      Muriel Robinson, Judge**

---

### No. M2003-01459-COA-R3-CV - Filed August 24, 2004

---

This appeal involves a custody dispute triggered by a paternity action. The trial court fashioned a permanent parenting plan which named Father the primary residential parent during the school year and Mother the primary residential parent during summer vacation. Mother appeals. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Clark Lee Shaw, Nashville, Tennessee, for the appellant, Terrell Lynn Simms.

Thomas K. Bowers, Nashville, Tennessee, for the appellee, Jamie Edward Hines.

### OPINION

Jamie Hines ("Father") and Terrell Simms ("Mother") are the parents of a minor child, a son, born August 2, 1999. The parties never married but lived together with their son until Mother announced in August 2001 that she was leaving Father and returning to her home in Missouri with their son.[1] Father petitioned the trial court to establish paternity,[2] enjoin Mother from removing their son from their home, set child support, and create a temporary parenting plan pending trial.

---

[1]Mother planned to live with her mother in St. Louis, Missouri and attend college.

[2]Tenn. Code Ann. § 36-2-305(b)(1)(C) permits a man claiming to be a child's father to file a complaint to establish parentage.

A temporary restraining order was issued enjoining Mother from moving with the child to Missouri.[3] Mother answered the paternity petition, countersued for child support, moved to dissolve the TRO and moved to restrain Father from forcing her from their home.[4] A restraining order was issued against Father restraining him both from forcing Mother to move from their home and removing the child from Mother's temporary physical possession pending trial.

Following a hearing in October 2001, the trial court[5] entered an order finding that Mr. Hines was the child's natural father and fashioned a temporary parenting plan which required Father to pay $475 per month in child support.[6] The TRO against Mother was dissolved, and she was granted permission to move to Missouri with the parties' son. The trial court further found that affording Father parenting time was in the best interest of the child, and accordingly named Father the residential parent for two five day periods out of each month, with Mother being the residential parent the remainder of the month.[7] Specifically the order provided that the "child shall reside with the Father every first and third Sunday from 7:00 p.m. to the following Friday at 7:00 p.m. The parties will meet at a designated location an equal distance from the parties' residences, which is the 'Waffle Hut' in Metropolis, Illinois."

Unfortunately, following Mother's move to Missouri with the child, the parties' relationship further deteriorated, and the scheduled bimonthly visitation exchanges often broke down into shouting matches that on occasion necessitated the police being involved.[8]

In June of 2002, a contempt petition was filed by Mother alleging that Father was late in child support payments and had not exercised visitation. A show cause hearing on the contempt was set for August. In the meantime, Father answered and denied the allegations and obtained a TRO against Mother enjoining her from assaulting Father. Following the show cause hearing, the trial court dismissed both contempt petitions and ordered that the temporary parenting plan remain in

---

[3]Chancellor Carol McCoy granted the TRO.

[4]Mother also sought attorney's fees and on appeal argues that the trial court abused its discretion in not awarding her fees under Tenn. Code Ann. § 36-2-311(a)(14) and Tenn. Code Ann. § 36-5-103(c).

[5]Circuit Judge Carol Soloman sat by interchange for Circuit Judge Muriel Robinson.

[6]The trial court found a downward deviation from the Child Support Guidelines was appropriate given the travel expenses Father would incur making four round-trips per month from Nashville to Missouri for visitation with his son.

[7]In addition, annual holidays were to alternate between the parents. In the event Mother did not move to Missouri, the order provided for the child to reside with Father three days each week and with Mother the remaining four days.

[8]The exchanges became so contentious with either Mother not showing up or claiming Father had not shown up that Father testified at trial that he always purchased gas in the vicinity of the exchange in order to produce gas receipts to prove the place, time and date of his attempted visits.

effect.[9] Once again, in January of 2003, Mother filed a contempt petition, and Father followed suit in February of 2003 with his own contempt petition against Mother. Both petitions alleged visitation violations.

In March 2003, the trial to establish the permanent parenting plan was held. Father testified that he should be his son's primary care giver since he was a teacher and considered education extremely important for his son. He also detailed numerous incidents both before and after the parties' separation where Mother was abusive both verbally and physically to him. Father further testified that Mother would take out her frustration with him on their son during the exchanges. Father's mother, Felicia Hines, testified to times she had witnessed Mother being abusive to her son both before their separation and at some of the visitation exchanges. In addition, Brittany Hazley, a friend of Father, also testified that she had observed Mother's and her male friend's misbehavior at visitation exchanges.

In contrast, Mother, acting *pro se*, testified that she loved her son and had always been the primary caregiver for him. When questioned briefly by the trial court, Mother explained she left Father because she felt she was having to do too much of the parenting by herself. Mother's mother, Rita Rivers, testified that her daughter was a loving, caring mother; that she and her husband had helped Mother and Father when the child was born; but that she did not want to interfere too much. In contrast, Ms. Rivers explained that Father's mother, Ms. Hines, was too involved with the situation and that she believed it was Ms. Hines, not Father, who was behind Father's request for custody. She further testified that Father had had some trouble keeping jobs. Mother's final witness was her aunt, Tina Brycen, who testified that Mother was a wonderful mother and that the child was a "mommy's boy" since he always had to be with Mother when she was not in school.

Following the proof and prior to announcing its decision, the trial court admonished Mother regarding her future conduct. The court stated:

> First off, from what I'm hearing, Ms. Simms, you're trying your best to defeat this man's relationship with his child. This Court will not allow you to do that, and if you continue to do it, then obviously you're not going to be any form of custodian here.
>
> You are both fit parents for this child. The problem is you don't respect each other. The proof shows that you have been volatile during these visitations. You curse in front of your child. You do things that are not appropriate for a parent. That evidence is overwhelming in this record. So, I'm going to do what I think is in the best interest and welfare of this child at this time.
> You picked this gentleman to be the father of your child, and you're going to have to deal with it until your child has reached majority which is 18 and graduates with his regular senior class. So, you all need to get in a mood to parent this child

---

[9]Counsel for Mother, Ralph Frazier, was permitted by the trial court to withdraw. From that point in December 2002, Mother represented herself *pro se* in the trial court.

3

appropriately, and have respect for each other. If you continue in your vain, you're going to lose all rights to this child. I find it to be in the best interest and welfare of this child that joint custody be the order of The Court. . . .[10]

The trial court's final order found that:

1. Both parties are fit to be parents.
2. Mother has attempted to defeat the Father's relationship with parties' minor child.
3. Neither party respects the other.
4. Mother curses in front of the minor child and conducts herself in a manner not in the best interests and welfare of the minor child. . . .

[T]he parties need to respect one another and in the event the Mother continues her inappropriate conduct in the presence of the child, she may lose any form of custodial rights to the child. . . .

The parties are hereby awarded joint custody of the minor child . . . . Until the minor child is enrolled in kindergarten, Mother shall be custodian from July 1st until December 31st. Father will be the custodian from January 1st until June 30th. . . .

Once the minor child is enrolled in kindergarten, the Father shall be custodian of the minor child during the school year, from two days before the beginning of school until the end of May. Once the child is enrolled in kindergarten and later years, Mother shall be custodian of the minor child for the months of June, July and August until two days before school starts in August. . . .

Mother shall have visitation of the minor child during Father's custodial periods for one weekend per month from 6:00 p.m. on the first Friday of each month until 6:00 p.m. on the next Sunday and for one optional weekend upon 48 hours notice to the Father. Father shall have the same visitation during the Mother's custodial periods. . . .

Mother is hereby restrained and enjoined from harassing, verbally abusing, or calling the Father or his family members any vile or ugly names.

The permanent parenting plan was attached to the trial court's final order. Mother appeals the trial court's plan because it makes Father the primary residential parent for their son once he enters kindergarten.

---

[10]The court also advised Mother that she needed to stop "ranting and raving" and that the parties needed to get along. The court stated that, as far as the future was concerned, the court was wiping the slate clean with regard to any previous bad conduct.

4

## I. RESIDENTIAL PARENTING PLAN

Tenn. Code Ann. § 36-6-404 requires every final custody order to incorporate a permanent parenting plan for any minor children the subject of a divorce, legal separation, annulment or separate maintenance action.

A parenting plan is defined in Tenn. Code Ann. § 36-6-402(3) as "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule, as well as an award of child support consistent with title 36, chapter 5." According to Tenn. Code Ann. § 36-6-404, a permanent parenting plan shall:

(a)(1) Provide for the child's changing needs as the child grows and matures, in a way that minimizes the need for further modifications to the permanent parenting plan;

(2) Establish the authority and responsibilities of each parent with respect to the child, consistent with the criteria in this part;

(3) Minimize the child's exposure to harmful parental conflict;

(4) Provide for a process for dispute resolution, before court action, unless precluded or limited by § 36-6-406; . . .

(5) Allocate decision-making authority to one (1) or both parties regarding the child's education, health care, extracurricular activities, and religious upbringing. The parties may incorporate an agreement related to the care and growth of the child in these specified areas, or in other areas, into their plan, consistent with the criteria in this part. Regardless of the allocation of decision making in the parenting plan, the parties may agree that either parent may make emergency decisions affecting the health or safety of the child;

(6) Provide that each parent may make the day-to-day decisions regarding the care of the child while the child is residing with that parent;

(7) Provide that when mutual decision making is designated but cannot be achieved, the parties shall make a good faith effort to resolve the issue through the appropriate dispute resolution process, subject to the exception set forth in subdivision (a)(4)(F);

Under the legislation, the court is to determine a residential schedule, which designates the primary residential parent and designates in which parent's home the child will reside on given days during the year. Tenn. Code Ann. § 36-6-402(5). A residential schedule is defined as:

. . . the schedule of when the child is in each parent's physical care, and it shall designate the primary residential parent [the parent with whom the child resides more than 50% of the time]; in addition, the residential schedule shall designate in which parent's home each minor child shall reside on given days of the year, including provisions for holidays, birthdays of family members, vacations, and other special

5

occasions, consistent with the criteria of this part; provided, that nothing contained herein shall be construed to modify any provision of § 36-6-108; . . . .

Tenn. Code Ann. § 36-6-402(5). When fashioning the residential schedule, the court is instructed to take into account the factors listed in Tenn. Code Ann. § 36-6-404(b):

. . . the court shall make residential provisions for each child, consistent with the child's developmental level and the family's social and economic circumstances, which encourage each parent to maintain a loving, stable, and nurturing relationship with the child. The child's residential schedule shall be consistent with this part. If the limitations of § 36-6-406 are not dispositive of the child's residential schedule,[11] the court shall consider the following factors:

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society which the child faces as an adult;
(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;
(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;
(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;
(5) The disposition of each parent to provide the child with food, clothing, medical care, education, and other necessary care;
(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;
(7) The love, affection, and emotional ties existing between each parent and the child;
(8) The emotional needs and developmental level of the child;
(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

---

[11]Tenn. Code Ann. § 36-6-406 instructs a court to limit the residential time for a parent that has engaged in certain specified conduct or exhibits certain traits, including, but not limited to: (1) willful abandonment; (2) physical or sexual abuse; (3) emotional abuse; (4) neglect or nonperformance of parental duties; or (5) an emotional or physical impairment which interferes with parental responsibilities. Neither party herein argues that the trial court should have utilized Tenn. Code Ann. § 36-6-406 to limit residential time with either parent.

6

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. . . .

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

These factors incorporate those set out in Tenn. Code Ann. § 36-6-106, the statute which guided the trial court in custody determinations prior to the parenting plan legislation. That statute has not been repealed. The factors set out in Tenn. Code Ann. § 36-6-106 are still relevant as are factors established by the courts. The primary concern in determinations of a child's residential placement remains the best interests of the child, and consideration of the factors under Tenn. Code Ann. § 36-6-404(b) still necessitates a comparative analysis.

Thus, by statute as well as case law, the welfare and best interests of the children are the paramount concern in custody and residential placement determinations, and the goal of any such decision is to place the child in an environment that will best serve his or her needs. *Parker v. Parker*, 986 S.W.2d 557, 562 (Tenn. 1999); *Lentz v. Lentz*, 717 S.W.2d 876, 877 (Tenn. 1986); *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983). The General Assembly has found that "[t]he best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care." Tenn. Code Ann. § 36-6-401(a). The aim of a custodial or residential arrangement is to promote the child's welfare by creating an environment that promotes a nurturing relationship with each parent. Tenn. Code Ann. § 36-6-404(b); *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996).

Trial courts must exercise broad discretion in child custody matters. *Parker*, 986 S.W.2d at 563. Like a custody decision, a determination of the best residential placement plan for a child must turn on the particular facts of each case. Such decisions often hinge on the trial court's assessment of the demeanor and credibility of the parents and other witnesses. *Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1992) . The trial court is in a far better position than this court to observe the demeanor of the witnesses and resolve the issues in the case that are based on the credibility of the witnesses. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitacker v. Whitacker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997).

Because of the discretion given trial courts in this area and because of the fact specific nature of such decisions, appellate courts are reluctant to second-guess a trial court's determination

regarding custody and visitation. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001); *Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1997) (quoting *Gaskill v. Gaskill*, 936 S.W.2d 626, 631(Tenn. Ct. App. 1996)). Accordingly, this court will decline to disturb the parenting plan fashioned by the trial court herein unless that decision is based on a material error of law or the evidence preponderates against it. *Nichols v Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990); *Adelsperger*, 970 S.W.2d at 485.

Here, the trial court determined that the Father should be the primary residential parent during the school year and Mother the residential parent during summer vacation. Because the parents live in different states, continuing the six-month residential placement split would necessarily prevent the child from attending the same school for an entire school year. Such a situation is generally not in the child's best interest, and the court properly divided residential time based on the school year.

Mother's real complaint is that Father, not she, was made residential parent for the school year. Mother asserts that the trial court was "not happy with [her] going to Missouri for the support of her family" and punished her for relocating.

We have carefully reviewed the trial transcript and find nothing to support Mother's claim that the trial was displeased with her move to Missouri. It is clear from the trial court's remarks during the hearing and in her final order that the court was displeased with Mother's "volatile" conduct. Specifically the trial court found that Mother had intentionally prevented the child from seeing his father, had insisted on arguing with Father in front of the child, and had made derogatory remarks about Father to the child.

Both parties presented testimony and made arguments about the other's failings. No purpose is served by our further recounting the details of those arguments herein. We have carefully reviewed the record herein as well as the trial court's ruling in light of specific arguments raised by Mother. We find there is no basis to conclude that the trial court did not fully consider all factors relevant to the custody or parenting plan for the parties' son. The fact that Father is a teacher and testified that he highly valued education appeared to impress the trial court that it would be in the child's best interest to live with Father during the school year. In addition, the court found that Mother had not acted in the child's interest by her behavior. The evidence does not preponderate against any of the trial court's factual findings. We find the trial court adopted a plan designed to serve the child's best interests. Accordingly, we affirm the parenting plan adopted by the trial court.

## II. ATTORNEY'S FEES

Tennessee follows the American Rule requiring "litigants to pay their own attorney's fees in the absence of a statute or contractual provision otherwise." *State v. Brown & Williamson Tobacco Corp.*, 18 S.W. 186, 194 (Tenn. 2000); *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W. 528, 534 (Tenn. 1998). In custody disputes, the question of whether to award attorney's fees and the amount of any such fees is largely in the discretion of the trial court, and the appellate court will not

interfere except upon a clear showing of abuse of that discretion." *Deas v. Deas*, 774 S.W.2d 167, 170 (Tenn. 1989).

Mother complains that the trial court erred in not awarding her attorney's fees pursuant to Tenn. Code Ann. § 36-2-311(a)(14) and § 36-5-103(c). Even if Mother were eligible for fees under either statute, we find the trial court did not abuse its discretion in denying her request for fees.

In his brief, Father complains that Mother's appeal is frivolous and that he is entitled to an award of attorney's fees. It is true that Tenn. Code Ann. § 27-1-122 permits this court to declare an appeal frivolous and award attorney's fees. An appeal is frivolous if it is devoid of merit or it is has no reasonable chance of success. *Wakefield v. Longmire*, 54 S.W.3d 300, 304 (Tenn. Ct. App. 2001). Despite the standard of review for custody determinations, such determinations are very fact dependent. We cannot agree with Father that Mother's appeal is frivolous and, therefore, we deny his request for attorney's fees.

## CONCLUSION

We affirm the trial court's judgment in all respects. Costs are taxed to the appellant, Terrell Lynn Simms.

_____
PATRICIA J. COTTRELL, JUDGE