# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
November 5, 2013 Session

## MICHAEL DAVIS HOLMES v. MARIA ELIZABETH HOLMES

**Appeal from the Chancery Court for Roane County**
**No. 2012-85    Frank V. Williams, III, Chancellor**

---

### No. E2013-01301-COA-R3-CV-FILED-FEBRUARY 3, 2014

---

In this divorce action, the sole issue on appeal is the propriety of the trial court's permanent parenting plan regarding the parties' three children. Concerning co-parenting, the parties were alternating weeks with their children during the pendency of the divorce. At trial, the parties agreed to continuation of this schedule, which provided each party equal co-parenting time with the children. The issues announced for trial regarding the children were (1) which parent should be named primary residential parent and (2) which parent would have final decision-making authority. The trial court, however, chose to implement a "divided" custody arrangement, wherein father was awarded primary custody and decision-making authority during the school year while mother was awarded primary custody and decision-making authority during the summer. Mother appeals. Discerning no abuse of discretion, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Browder G. Williams, Kingston, Tennessee, for the appellant, Maria Elizabeth Holmes.

John D. Lockridge and Mario L. Azevedo, II, Knoxville, Tennessee, for the appellee, Michael Davis Holmes.

**OPINION**

I. Factual and Procedural Background

The parties to this action, Michael Davis Holmes ("Father") and Maria Elizabeth Holmes ("Mother"), were married for thirteen years. Three children were born of the marriage: Mica, now age ten; Quillen, now age five; and Keller, now age four ("the Children"). The Children have resided with the parties in the same neighborhood in Harriman throughout their lives. The parties separated in April 2012, with Mother and the Children remaining in the marital residence and Father relocating down the street to a rental home owned by the parties.

For the first few months of the parties' separation, the Children resided primarily with Mother and spent co-parenting time with Father. In the summer of 2012, the parties embarked upon a new co-parenting residential schedule wherein the Children spent alternating weeks with each parent. This arrangement continued up to the date of trial, although no formal agreement or order was entered memorializing this co-parenting schedule. When the trial commenced, each party's attorney represented that the parties were in agreement regarding continuation of the alternate-week schedule. Therefore, as regarding the Children, the only issues presented for trial were (1) which parent would be named primary residential parent and (2) which parent would maintain ultimate decision-making authority.

Dr. Robert Wahler was retained to perform a custody evaluation in this cause. Dr. Wahler reported that the parties' current alternate-week arrangement was successful in that the Children were happy, mentally healthy, and well adjusted. He also explained, however, that the parties were "deadlocked" in their opinions regarding certain issues and that neither party was willing to compromise. Dr. Wahler recommended continuation of the current co-parenting schedule despite the parents' inability to agree.

During Dr. Wahler's testimony regarding the parenting plan, the following exchange took place between Dr. Wahler and Father's counsel:

Mr. Lockridge: It's been agreed, Doctor, that it's going to be a continuing fifty/fifty. But there are certain places in the parenting plan – we have somebody to be in charge of educational decisions, somebody to be in charge of religious decisions, somebody to be in charge of medical decisions, and a residential parent. Do you have any recommendations?

Dr. Wahler: Well, that was the last thing I covered in my report. I'm afraid I can't be of much help there, because my primary thought is that these two parents, who excel in their parenting tasks, have got to find a way to become partners in decision-making. They both want the best for their children, but they have this incredible difficulty in joint productive communication. So, by [and] large, that's the name of the problem, is that they seem unable to have discourse that would lead to decision-making that both of them could accept.

Now, maybe things could become more pliable. But I also indicated in my report I do not want to appoint or should there be appointed a parent who has primary decision-making power, because I'm afraid that would just exacerbate the problems that these parents have with one another.

There needs to be some way to do this. I can't imagine how it's going to work, though, because they've been in marital therapy. Nothing seems to have generated any semblance of what I would call cooperative discussions with regard to these issues of decision-making.

Dr. Wahler also opined that the Children needed continuity and predictability, such that a disruption of Mica's school or Quillen's neighborhood and friends was not recommended. In summary, Dr. Wahler recommended that the parents continue to share parenting responsibility, but he acknowledged that they did not agree about "really anything" and anticipated that there could be problems stemming from their lack of cooperation in the future.

Father and Mother each filed proposed parenting plans that incorporated the alternate-week schedule, essentially affording each party equal time with the Children. Father's plan, however, named him as primary residential parent and granted him final decision-making authority. Conversely, Mother's plan designated her as primary residential parent, providing her final decision-making authority. While testifying, both parties affirmed agreement with the alternate-week schedule. Additionally, Father testified that he wanted the Children to be able to attend his church as much as possible and wanted the Children to remain in their current neighborhood and school. Mother, for her part, wished to relocate from Harriman and felt that the Oak Ridge school system had better schools and opportunities for the

Children.  As she explained, Oak Ridge was also closer to her place of employment.  She had no immediate plans to move, however, and stated that she was looking at houses in several different neighboring communities.

At the conclusion of the proof, the trial court ruled from the bench, stating in pertinent part:

Well, I was impressed with Dr. Wahler, truthfully.  I thought he was somebody who had taken an objective look at not only the children, but both parents, and that his testimony was persuasive with the exception that I'm – I'm having a little difficulty seeing how the present situation of week on week off over the long-term is a workable solution.

But there's another way of looking at this thing.  I mean, it's something that I've done several times in the past in situations like this where you have husbands and wives that can't get along, that fight like dogs, and a divorce seems inevitable, but are individually good parents.  And I think that's what we've got here, and that's the way that I'm looking at both of them.

But I think there's a way to deal with it other than a week on and a week off, and that is to have what I used to call split custody.  And that is to have one parent have custody during the school year and the other parent to have custody during the summer months, and to have each of them have the decision making authority during that part of the year in which they have primary custody.

And so what I think ought to happen is that the dad ought to keep them during the school year and the mom ought to keep them during the summer months, and each of them would be the primary parent, residential parent, during their part of the year.

Now, during the time that the father is the primary residential parent, during the school year, the mom would have first and third weekends of every month.

During the summer, when the mom is the primary residential parent, the dad would have the first and third weekends of every month.

. . .

-4-

And there's no reason why we can't get close to an equal number of days. And I think, in that regard, I'm not so much concerned about exact equality, as I am the children having some sort of continuity of contact with each of the parents and to grow up knowing and being close to their mother and their father. And so exact equality is not a real issue for me.

The trial court entered an order establishing Father as primary residential parent during the school year with Mother to enjoy co-parenting on the first and third weekends of every month during the school year. The order further stated that Mother would be primary residential parent during the summer with Father enjoying co-parenting on the first and third weekends of every month during the respective period.

Mother subsequently filed a motion seeking alteration of the trial court's judgment. Mother asserted in the motion that the parties had proposed an alternate-week schedule for co-parenting and that Dr. Wahler recommended this schedule as in the best interest of the Children. Mother argued that Tennessee Code Annotated § 36-6-101(a)(2)(A)(i) provides that when the parties have agreed in open court to joint custody, there is a presumption that joint custody is in the best interest of the children unless the court finds clear and convincing evidence to the contrary. Mother posited that because no evidence was offered that a joint custody arrangement was not in the Children's best interest, the court erred in failing to award joint custody.

Relative to the motion, the trial court conducted a hearing on April 26, 2013, ruling in pertinent part:

There are a number of things in this case that – that I would have to find, had been shown to me and that appeared to be incontrovertible proof beyond – by clear and convincing proof. And that is exactly what the two lawyers have said here, and that is that these two former spouses can't get along with one another. They can hardly communicate if they do need to communicate, and that – this is not good for the children.

And with regard to the week on and week off arrangement, it may have been what they had been doing, but I certainly have never made any determination about that prior to the date of trial. And while the parties may have – not have been anticipating what I did, it's something that I have done in a number of other cases throughout the past 28 years.

. . .

And what I'm saying, then, in this case, that in so far as the children are concerned, given the high state of animosity between the parents, that in this case, it's better not to have the week on and the week off, but to split it up between the summer months and the school months.

And then to try to make up some of that, by giving the mom more time during the school year by adding the fall break, and the spring break, after Christmas break. And I would add to that, that if there – there are some months that have five weekends as opposed to just four. So that I would add that in those months where there are five Saturdays, that the mom gets three of those. And so that she would get an additional weekend on those – on those months.

And I find that in this case, that that seemed to me to be the only way to go to minimize the impact, not only on the children, but to keep down as much as possible the conflict between this father and this mother, who would then have parenting decisions somehow divided between them during the entire 365 days a year by giving one parent all of the parenting decisions during one part of the year, mainly the summer, and one parent all the parenting decisions during the other part of the year, that is the school year. And that way –

There were some – I forget now about the religious differences. But there were some religious differences here. Where is the – where are the children going to go to school or church? Well, the way you handle that is to let the parent that has parenting during the summer make those decisions, and the parent that has the parenting during the school year make those decisions. And that seems eminently reasonable to me.

There doesn't seem to be any chance for confusions, or conflict, or argument between the parties over those issues when you divide it up that way. Otherwise, if they both have joint custody throughout the entire 365 days of the year, then you've got to find some other way, so that each of them has some influence over the children during the entire year. And so I don't – I don't see anything detrimental about – about this.

The business about the ability of the mom, who would be – I believe Mr. Williams said 20 miles away, living 20 miles away in Oak Ridge, when the children are going to be going to school in Harriman, that that would be an extremely long drive from her home to the children's school in the morning,

and then in the afternoon from the school back to her home in Oak Ridge during the school year. And that – that, again, is something that to spend that much time on the road, and back roads at that, would – would be something, if possible, that – that would be good to avoid.

And so it's – this takes into account geography. It takes into account personalities. It takes into account a lot of issues that these parties have between themselves.

. . .

And, again, with regards to the – the school – all this testimony about the superiority of the Oak Ridge school systems, I just didn't accept that as the real reason that I was being given for why the mother . . . . I thought that the mom wanted to get herself and the children away from the – the husband. And so that was my impression.

The trial court entered an order denying the motion seeking to alter or amend the judgment, except the court did grant Mother co-parenting during the fifth weekend in those months when Father is the primary residential parent and there are five weekends in the month. The trial court certified the order to be a final judgment pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. The court also entered a permanent parenting plan memorializing its ruling, which ultimately awards Father 248 days annually and Mother 117 days annually with the Children. Mother timely appealed.

## II. Issue Presented

Mother presents a single issue for this Court's review:

Whether the trial court erred in fashioning the permanent parenting plan order by failing to adopt the residential schedule that was agreed upon by the parents and supported by expert testimony.

## III. Standard of Review

This Court employs an abuse of discretion standard of review applicable to a trial court's determination of an appropriate parenting plan. "[C]ustody and visitation arrangements are among the most important decisions confronting a trial court in a divorce case. The needs of the children are paramount; while the desires of the parents are

secondary." *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). As this Court stated in *Gaskill*:

> Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law.

*Id*. at 631. Further, our Supreme Court has stated:

> It is not the function of appellate courts to tweak a visitation order in the hopes of achieving a more reasonable result than the trial court. Appellate courts correct errors. When no error in the trial court's ruling is evident from the record, the trial court's ruling must stand. This maxim has special significance in cases reviewed under the abuse of discretion standard. The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving visitation, to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution. An abuse of discretion can be found only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001) (internal citations omitted).

## IV. Appropriate Parenting Plan

Mother contends that the trial court should have implemented the parties' agreement regarding co-parenting and utilized an alternate-week residential arrangement. Mother directs this Court to the provision contained in Tennessee Code Annotated § 36-6-101(a)(2)(A)(i), which states, "Unless the court finds by clear and convincing evidence to the contrary, there is a presumption that joint custody is in the best interest of a minor child where the parents have agreed to joint custody or so agree in open court at a hearing for the purpose of determining the custody of the minor child." Mother posits that because the parties agreed to joint custody with an alternate-week schedule, the trial court was required to find clear and convincing evidence that such a schedule was not in the best interest of the

children in order to fashion a different schedule. Mother asserts that the trial court failed to find such clear and convincing evidence in this case.

Mother's argument is unavailing, however, because this Court has previously found that such a divided-time arrangement as was instituted in this case is actually a form of joint custody. *Burlew v. Burlew*, No. 02A01-9807-CH-00186, 1999 WL 545749 at *9 (Tenn. Ct. App. July 23, 1999) (reviewed and affirmed on other grounds by *Burlew v. Burlew*, 40 S.W.3d 465 (Tenn. 2001)). Ergo, Tennessee Code Annotated § 36-6-101(a)(2)(A)(i) is inapplicable to this case. Further, as we noted in *Human v. Human*, No. E2012-01853-COA-R3-CV, 2013 WL 5373039 at *6 (Tenn. Ct. App. Sept. 23, 2013)*,* the trial court was not required to "adopt wholesale one of the plans proposed by the parties. Rather, the Trial Court was required to make a custody determination based upon the best interests of the Children considering all of the relevant factors. Tenn. Code Ann. 36-6-106(a)." Mother's argument that the trial court erred by not adopting either of the parties' proposed plans regarding residential schedules is without merit.

In fashioning an appropriate, initial permanent parenting plan, the trial court must evaluate the comparative fitness of both parents by considering numerous statutory factors. *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050 at *3 (Tenn. Ct. App. July 19, 2005). *See also Parker v. Parker*, 986 S.W.2d 557, 562 (Tenn. 1999); *Gaskill*, 936 S.W.2d at 630. For example, Tennessee Code Annotated §36-6-106 (Supp. 2013) provides that when determining an appropriate custody arrangement, the trial court shall consider the following:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . .

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers. . .

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . .

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

Similarly, Tennessee Code Annotated §36-6-404 (2010) provides that an appropriate parenting plan shall:

(1) Provide for the child's changing needs as the child grows and matures, in a way that minimizes the need for further modifications to the permanent parenting plan;

(2) Establish the authority and responsibilities of each parent with respect to the child, consistent with the criteria in this part;

(3) Minimize the child's exposure to harmful parental conflict;

(4) Provide for a process for dispute resolution, before court action, unless precluded or limited by § 36-6-406; . . .

(5) Allocate decision-making authority to one (1) or both parties regarding the child's education, health care, extracurricular activities, and religious upbringing. The parties may incorporate an agreement related to the care and growth of the child in these specified areas, or in other areas, into their plan, consistent with the criteria in this part. Regardless of the allocation of decision making in the parenting plan, the parties may agree that either parent may make emergency decisions affecting the health or safety of the child;

(6) Provide that each parent may make the day-to-day decisions regarding the care of the child while the child is residing with that parent;

(7) Provide that when mutual decision making is designated but cannot be achieved, the parties shall make a good-faith effort to resolve the issue through the appropriate dispute resolution process, subject to the exception set forth in subdivision (a)(4)(F);

(8) Require the obligor to report annually on a date certain to the obligee, and the department of human services or its contractor in Title IV-D cases, on a form provided by the court, the obligor's income as defined by the child support guidelines and related provisions contained in chapter 5 of this title; and

(9) Specify that if the driver license of a parent is currently expired, canceled, suspended or revoked or if the parent does not possess a valid driver license for any other reason, the parent shall make acceptable transportation arrangements as may be necessary to protect and ensure the health, safety and welfare of the child when such child is in the custody of such parent.

(b) Any permanent parenting plan shall include a residential schedule as defined in § 36-6-402. The court shall make residential provisions for each child, consistent with the child's developmental level and the family's social and economic circumstances, which encourage each parent to maintain a loving, stable, and nurturing relationship with the child. The child's residential schedule shall be consistent with this part. If the limitations of § 36-6-406 are not dispositive of the child's residential schedule, the court shall consider the following factors:

> (1) The parent's ability to instruct, inspire, and encourage the
> child to prepare for a life of service, and to compete successfully
> in the society that the child faces as an adult;

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

Mother further argues that the trial court failed to make specific findings of fact that supported its decision in this case. As this Court has explained:

> [T]he trial court was obligated to consider the applicable statutory factors in Section 36-6-106(a) in reaching its decision regarding the comparative fitness of the parties. *See Burnett v. Burnett*, 2003 Tenn. App. LEXIS 508, E2002-01614-COA-R3-CV, 2003 WL 21782290, at *6 (Tenn. Ct. App. July 23, 2003). "However, the statute does not require a trial court, when issuing a memorandum opinion or final judgment, to list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination." *Id*. Moreover, not every factor is applicable in a given case, and the trial judge is required to consider only the factors which are applicable. *Id.; see also Mueller v. Mueller*, 2004 Tenn. App. LEXIS 770, W2004-00482-COA-R3-CV, 2004 WL 2609197, at *6 (Tenn. Ct. App. Nov.17, 2004).

*Human*, 2013 WL 5373039 at *5 (quoting *Bell v. Bell*, No. W2004-00131-COA-R3-CV, 2005 WL 415683 (Tenn. Ct. App. Feb. 22, 2005)). When the trial court fails to make specific findings of fact with regard to the relevant statutory factors, however, we must review the evidence in the record *de novo* to determine where the preponderance of the evidence lies. *See Darvarmanesh*, 2005 WL 1684050 at *4. *See also Ward v. Ward*, No. M2012-01184-COA-R3-CV, 2013 WL 3198157 (Tenn. Ct. App. June 20, 2013).

Contrary to Mother's assertion, we find that the trial court did make findings of fact regarding the best interest of the Children in relation to the statutory factors listed above. The court found that the parents were unable to agree or cooperate on certain matters, noting that they "fight like dogs." The court opined that the best way to arrange co-parenting in this case was "to have one parent have custody during the school year and the other parent to have custody during the summer months, and to have each of them have the decision making authority during that part of the year in which they have primary custody." The court found that the alternate-week schedule would not be successful over an extended period because of the parental differences of opinion. Therefore, the trial court crafted a plan that was intended to "minimize the [Children's] exposure to harmful parental conflict" as provided in Tennessee Code Annotated §36-6-404 (a)(3). The trial court also determined that this would provide the Children "continuity of contact with each of the parents and to grow up knowing and being close to their mother and their father," which relates to the "love and emotional ties between the parent and Children" as well as "the importance of continuity" in Tennessee Code Annotated §36-6-106 (a)(1) and (3).

In its subsequent order regarding the motion to alter or amend, the trial court entered additional findings. The court again highlighted the parties' deleterious parental conflict and referenced the parties' inability to cooperate in choosing which school or church the Children should attend. The court noted that if Mother moved to Oak Ridge, which she indicated she might do, this arrangement would avoid having the Children travel a greater distance to and from school each day. Such considerations relate to the statutory factor concerning continuity. Finally, the court expressed concern that the actual reason for Mother's proposed move was to keep herself and the Children away from Father. This finding would relate to Tennessee Code Annotated §36-6-106 (a)(10), regarding Mother's willingness to "facilitate and encourage a close and continuing parent-child relationship between the [Children] and both of the [Children's] parents."

Following a thorough review of the record, we conclude that the trial court's findings are supported by a preponderance of the evidence. Both parties admitted at trial that they disagreed on certain major decisions involving the Children, specifically which church and school the Children should attend. Further, there was testimony that Mother desired to move from the Harriman community and enroll the Children in a different school system, notwithstanding Dr. Wahler's opinion that such a move would be detrimental to the Children.

We further conclude that the trial court did not abuse its discretion with regard to the co-parenting residential schedule instituted. Dr. Wahler opined that while the alternate-week schedule had been successful for a few months, he could foresee problems developing in the future, given the parents' difficulty with cooperation. The trial court's ruling does not fall outside the spectrum of rulings that might reasonably result from an application of the correct

-14-

legal standards to the evidence found in the record. *See Eldridge*, 42 S.W.3d at 88. We conclude, therefore, that the trial court's permanent parenting plan should be affirmed.

## V. Conclusion

The judgment of the trial court regarding the permanent parenting plan is affirmed. Costs on appeal are taxed to the appellant, Maria Elizabeth Holmes. This case is remanded to the trial court, pursuant to applicable law, for collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE