IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 31, 2018 Session

## ROBIN LEAH LOUISE FARNHAM CARTER v. MYRON THOMAS CARTER

**Appeal from the Chancery Court for Knox County**
**No. 183997-3          Michael W. Moyers, Chancellor**

_____

**No. E2017-01648-COA-R3-CV**
_____

This appeal concerns visitation and parenting responsibilities following a divorce. The trial court granted decision-making authority over both children, a son and a daughter, to the father. After granting both parties 50/50 visitation with the son, the court awarded the father most of the visitation time with the daughter. The mother appeals. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, C.J. joined.

Stephanie L. Prager, Knoxville, Tennessee, for the appellant, Robin Leah Louise Farnham Carter.

Sarah Y. Sheppeard, Knoxville, Tennessee, for the appellee, Myron Thomas Carter.

**OPINION**

**I. Background**

Myron Thomas Carter ("Father") and Robin Leah Louise Farnham Carter ("Mother") (collectively referred to as "the Parties") began a protracted divorce process on October 23, 2012. The Parties had a long-term marriage of twenty-one years. Both sought that the primary residence of the Parties' minor children be with them.

After the complaint for the divorce was filed, the Parties and their children continued to reside together in the marital residence for over two years. At some point between the filing of the divorce and June 14, 2013, Mother insisted that all communication between the Parties be made by email, even though the Parties were residing in the same house. This demand continued even when the Parties were in the same room and in the presence of the children.

In January 2015, following a hearing and agreement announced to the court on December 11, 2014, the Parties' first co-parenting order was issued. This order provided for the Parties to have equal time with the children and outlined how the Parties would tell the children about the pending divorce. The parenting plan also gave the non-supervising parent the option of first refusal when the supervising parent needed a caregiver.

In September 2015, just a brief time before the trial was to resume, the Parties attempted one of multiple mediations. A mediator's report was filed on September 17, 2015, and revised parenting plans were submitted on behalf of each party that same week. At this point in time, Father sought more than fifty-fifty visitation with the children.

When the trial resumed on September 22, 2015, each party testified at length about facts related to the statutory custody factors. Mother repeatedly stated that she has been the primary caretaker for the children prior to the divorce action, a fact not in dispute. However, even before the Parties' separation, Mother and the Parties' daughter had experienced a bad relationship. They argued often, resulting in yelling, with the daughter sometimes hitting Mother. Frequently, both Mother and daughter went to their respective bedrooms to cry. A review of the events shows that problems existed between the daughter and Mother prior to the Parties' separation. In a deposition in October 2013, Mother testified about the fights between herself and daughter. From the time of the Parties' separation in January 2015 and the custody portion of the trial in September of that year, their relationship worsened. At trial, Mother described her relationship with daughter by observing, "[i]t is not good." She also related that the daughter is angry with her and described the relationship as "very strained." Mother acknowledged that the daughter had told her that she did not want to live with her, and there was corroborating testimony to that effect.

In the memorandum opinion, entered October 5, 2015, the trial court observed that daughter "testified adamantly and emphatically and quite emotionally" that she wished to spend most of the time with Father. The court also spoke of both parents, acknowledging that the daughter was closer to Father than Mother. The court further noted that "it is apparent to the court that for whatever reason the relationship between [the daughter] and her mother has been so damaged that at this point it seems beyond repair." The court considered the fifty-fifty agreement but decided that it was not in the daughter's best interest. As to the son, the trial court did grant fifty-fifty visitation. Father's proposed parenting plan was adopted on a temporary basis; the court also required counseling to occur with Dr. Candice Blake and directed that the situation would be revisited at the end of the school year.

On October 4, 2016, the court entered an order related to the final hearing on the custody issue:

> The parties, through counsel, represented to the Court that they have been operating under the Temporary Parenting Plan provisions ordered by the Court in its October 5, 2015 Memorandum Opinion Order and further that counseling with Candice Blake has been concluded. It is [Mother's] position that Dr. Blake did not counsel with the entire family. It is further her position that the counseling

2

that did occur has not resolved the issues that caused the Court to order counseling previously. [Father] objected to further counseling, but the parties, through counsel, acknowledge that there are still significant issues especially between [Mother] and the parties' daughter. Therefore, the Court hereby orders that the parties meet with Shannon Wilson, PhD, for family counseling in an effort to improve the relationship between [Mother] and the parties' daughter, to improve communication between [Mother] and [Father], and to address such other issues as Dr. Wilson deems appropriate. The Court further finds that the family counseling shall be directed by Dr. Wilson, who shall meet with the various family members as she deems appropriate for a reasonable period of time. In the meantime, the Court's prior orders regarding co-parenting shall remain in full force and effect and a revised Temporary Parenting Plan should be entered to specifically contain said co-parenting provisions.

Thus, more counseling ensued, with yet another counselor. Unfortunately, the relationship between the daughter and Mother continued to deteriorate. At a final hearing on May 15, 2017, Mother described the current situation with daughter, giving specific examples of "a multitude of issues." She described an unhappy teenager over whom she has utterly no control. According to Mother, when the daughter is at her house, she "stays in her room and doesn't come out or talk or anything."

After the hearing, the court adopted the temporary parenting plan as its Permanent Parenting Plan. In the final order, the court found:

With regard to the children, the Court has required [Mother] and specifically her daughter … to engage in counseling to fix their troubled relationship. It appears to the Court that these efforts have failed. [Mother]'s relationship with [daughter] continues to be problematic, and the Court does not find it in the best interest of the child … to force the issue any further.…It is the Court's fervent hope that the relationship will someday be repaired, but the Court has done all that it reasonably can in this regard.

As a result, the father received 285 days a year and all major decision-making authority in regard to the daughter. Mother only received 80 days a year with the daughter. In regard to the son, the parents received a fifty-fifty split of time and Father was given the major decision-making authority, except religion. Mother timely appealed this judgment.

## II. ISSUES

The issues raised on appeal by Mother are restated as follows:

A. Regarding the Parties' minor daughter, did the court err by making an initial custody determination without conducting a comparative fitness analysis as to both parents as required by Tennessee Code Annotated section 36-6-106, and instead relied on daughter's testimony.

3

B. Regarding the Parties' minor son, did the court err by making an initial custody determination without conducting a comparative fitness analysis as to both parents as required by Tennessee Code Annotated section 36-6-106, particularly where no rationale for the designation of Father as primary residential parent with most of the decision-making authority is concerned.

### III. STANDARD OF REVIEW

The appropriate standard of "review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013); *See* Tenn. R. App. P. 13(d). Specifically, "whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." *Id.* Therefore, these findings are given the presumption of correctness, unless the evidence preponderates against them. *Id* at 693. Appellate courts should not overturn a trial court's decision merely because reasonable minds could reach a different conclusion. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

"Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). The paramount concern in a custody case is the welfare and best interest of the parties' minor children, *Ruyle v. Ruyle*, 928 S.W.2d 439, 441 (Tenn. Ct. App. 1996), the determination of which necessarily turns on the particular facts of each case. *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). The trial court is obligated to consider all the appropriate factors in reaching its decision regarding custody. *Woods v. Woods*, No. M2006-01000-COA-R3-CV, 2007 WL 2198110, at *2 (Tenn. Ct. App. July 26, 2007).

On appeal, the trial court's decision regarding parenting schedules is reviewed for an abuse of discretion. *Armbrister*, 414 S.W.3d at 693. While "[t]rial courts are vested with wide discretion in matters of child custody," the appellate courts may interfere with the lower court's ruling "upon a showing of erroneous exercise of that discretion." *Koch*, 874 S.W.2d at 575. A trial judge abuses his discretion when he applies an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence or relies on reasoning that causes an injustice. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). "Appellate courts should reverse custody decisions 'only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence.'" *Kelly v. Kelly*, 445 S.W.3d 685, 696 (Tenn. 2014).

### IV. DISCUSSION

Custody and visitation arrangements are viewed as some of the most important decisions that a trial court will have to make. *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006). A trial court's child custody determination is factually driven, and the court must consider all of

the facts and circumstances involved in reaching its decision. *Chaffin*, 211 S.W.3d at 286. While trial courts have broad discretion to make decisions regarding parenting arrangements, those determinations must be made based on proof and applicable principles of law. *Id.*

Pursuant to Tennessee Code Annotated section 36-6-404(a), any final decree in an action for absolute divorce involving a minor child shall incorporate a permanent parenting plan, defined in Tennessee Code Annotated section 36-6-402(3) as "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a Residential Schedule." The trial court is charged with determining a residential schedule, which defines one party the primary residential parent and designates in which parent's home the child will reside on given days during the year. Tenn. Code Ann. § 36-6-402(5).

Tennessee Code Annotated section 36-6-406 contains a list of reasons to limit or restrict a parent's co-parenting time. If the limitations of section 36-6-406 are not dispositive for determining the child's residential schedule, the court considers the factors found in section 36-6-106(a)(1)-(15). Tenn. Code Ann. § 36-6-404. The former limitations do not apply to the case at bar; therefore, the court considered the latter fifteen factors. These factors include:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education, and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

5

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . .;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person…;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a)(1)-(15).

Mother argues on appeal that the trial court did not properly conduct the necessary comparative fitness analyses required in this matter.

### A. Daughter

When applying the statutory factors to the facts of the case, factor one looks at the strength, nature, and stability of the child's relationship with each parent. This factor favors Father. The testimony given at trial reveals that the daughter's relationship with Father is much stronger than her relationship with Mother. The record reveals that Father is a steady source of aid and comfort to daughter - helpful with problems, fair in discipline and dependable. On the other hand, Mother and daughter have a volatile relationship that includes arguing and shouting, mutual disrespect, crying, and failure to problem solve or compromise. The evaluation of the second part of the factor, which focuses on the majority of parenting responsibilities, has

6

changed over time. Mother was a stay-at-home mom before the divorce. At the separation, the Parties agreed to equal co-parenting. After the trial, Father became the primary caregiver. As a whole, factor one favors Father.

Factor two, each parent's past and potential for future performance of parenting responsibilities, also favors Father. The toxic relationship between Mother and daughter has been a problem for years. At the final hearing, Mother noted that their relationship is far worse than it was previously. Also, at this final hearing, the daughter spoke about how great a relationship she had with Father. Based on these statements, it is clear that comparatively Father has a stronger potential for future performance of parenting responsibilities in regard to the daughter.

Factor five was the crux of Mother's argument, focusing on who is the primary caregiver. Mother points out that as a stay-at-home mom, she was the primary caregiver for the majority of the daughter's life. However, at the time of the final hearing, Father had been the caregiver for a little over a year and a half. Further, although this factor now weighs in favor of Father, even if it were found to the contrary, it would not be dispositive of the total analysis.

Factor six focuses on the love, affection and emotional ties existing between each parent and the child. Based on the aforementioned relationship status between each parent and the daughter, comparatively this factor favors Father. Even if the factor were found to not favor Father, there is no conceivable basis for finding that this factor favors Mother.

Factor seven, focusing on the emotional needs and developmental level of the child, favors Father. Although the daughter was a mature young lady when she testified at age fourteen and is rapidly approaching the age of majority, Mother appears unable to adequately comprehend and address the daughter's emotional needs. On the other hand, Father helps the daughter work through emotional problems and provides constant support.

In evaluating factor eight, the court focused on the mental and emotional fitness of each parent as it relates to their ability to parent the child. As the court noted in its October 2015 memorandum opinion, Mother described Father as having an anger management problem and prone to angry outbursts. Father explained his frustration with Mother, which grew from her trust issues that resulted in constant interrogation about nonexistent affairs. Upon review, the court found that the daughter's testimony bolstered Father's assertions. Accordingly, this factor leans in favor of finding Father to be comparatively more fit in regard to the daughter.

Factor ten focuses on the continuity and stability of the child's life and the length of time in that environment. This factor favors Father, as the daughter's stable life stems from living with him. This has been the situation for two and one-half years. Over this time, the daughter's relationship with Mother has continued to deteriorate.

Factor thirteen, focusing on the reasonable preference of a child, if twelve years of age or older, strongly favors Father. The daughter is over the age of twelve and clearly prefers living with Father.

Factors three, four, nine, eleven and twelve are inapplicable to the case at bar. Factors fourteen and fifteen did not favor either parent.

Based on the standard of review relevant in this matter, we find no grounds to overturn the trial court's determination on the parenting plan as it relates to the daughter. There is no evidence in the record that the trial court applied an incorrect legal standard, reached an illogical result, resolved the case on a clearly erroneous assessment of the evidence or relied on reasoning that causes an injustice. Therefore, the preponderance of the evidence supports the correctness of the trial court's assessment.

## B. Son

Upon our review, we find that the trial court properly considered the law and the evidence in conducting a comparative fitness analysis with regard to the Parties' son. Even though the court never expressly listed all the factors that were considered in the parties' son's parenting plan, there is sufficient evidence that the trial court conducted an analysis. Although the court was obligated to consider the applicable statutory factors, "the statute does not require a trial court, when issuing a memorandum opinion or final judgment, to list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination." See *Burnette v. Burnette*, No. E2002-01614-COA-R3-CV, 2003 WL 21782290, at *6 (Tenn. Ct. App. July 23, 2003). A key signal that the trial court conducted an appropriate analysis on behalf of the son is the fact that a different co-parenting schedule exists for the son. Mother's argument that no analysis was conducted lacks merit.

The record is littered with examples of the parents not being able to communicate or truly having the ability to make a joint decision. Therefore, the trial court was tasked with determining which parent is better suited to make the major decisions for the son except religion. Based on all the facts and testimony presented in this case, the trial court concluded that Father was best suited to make these decisions for the son. The record reveals that Father appears to be a comparatively more stable parent. Further, Father has already been awarded the ability to make these decisions for the daughter. Therefore, the trial court found it was in the son's best interest that Father make the major decisions for him.

There are no grounds before us to support overturning the trial court's determination of the parenting plan as to the son. The court clearly made this decision based on the testimony and evidence presented. We find there is no proof in the record that the trial court applied an incorrect legal standard, reached an illogical result, resolved the case on a clearly erroneous assessment of the evidence or relied on reasoning that causes an injustice. Thus, the preponderance of the evidence supports the correctness of the trial court's assessment.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Robin Leah Louise Farnham Carter.

_____
JOHN W. MCCLARTY, JUDGE