# IN THE COURT OF APPEALS OF TENNESSEE
## MIDDLE SECTION AT NASHVILLE

| | | |
|---|---|---|
| WILLA JEAN GASKILL, | ) | |
| | ) | |
| Plaintiff/Appellee, | ) | |
| | ) | Montgomery Chancery |
| | ) | No. 95-78-114 |
| VS. | ) | |
| | ) | Appeal No. |
| | ) | 01-A-01-9512-CH-00559 |
| STEVEN WAYNE GASKILL, | ) | |
| | ) | |
| Defendant/Appellant. | ) | |


APPEAL FROM THE CHANCERY COURT
FOR MONTGOMERY COUNTY
AT CLARKSVILLE, TENNESSEE

THE HONORABLE JOHN H. GASAWAY, III, JUDGE

For the Plaintiff/Appellee:

Kevin C. Kennedy
THE KENNEDY LAW FIRM
Clarksville, Tennessee

For the Defendant/Appellant:

Mark A. Rassas
RASSAS & RASSAS
Clarksville, Tennessee

# REVERSED AND REMANDED


WILLIAM C. KOCH, JR., JUDGE

# **O P I N I O N**

This appeal involves the custody of a four-year-old girl. After slightly more than two years of marriage, the mother filed a divorce petition in the Chancery Court for Montgomery County requesting custody of the parties' only child. Following a bench trial, the trial court declared the parties divorced and awarded custody to the mother. The husband asserts on this appeal that he is comparatively more fit than the mother to have custody. We agree and, therefore, reverse the trial court's award of custody to the mother.

## **I.**

Willa Jean Gaskill and Steven Wayne Gaskill met at a bar near Fort Dix in New Jersey. Mr. Gaskill was a 22-year-old serviceman, and Ms. Gaskill was a 25-year-old single mother with a son who was approximately three years old. They began seeing each other, and their daughter, Briahna, was born in March 1992. Mr. Gaskill was discharged from the Army a few months later, and the couple moved to Florida where they were married in June 1992.

The couple lived near Orlando with Mr. Gaskill's mother immediately after their marriage. They moved into their own apartment three months later and shortly thereafter moved to Albany, Georgia where Mr. Gaskill found work as an industrial electrician. He worked at several different jobs because the work required long hours and the projects were of short duration. Ms. Gaskill also worked outside the home but primarily spent her time taking care of her two young children.

The parties' relationship deteriorated, and they separated in September 1994. Mr. Gaskill moved back to Florida to be near his family. He found work managing a Radio Shack store and moved into a condominium that he now shares with his girlfriend who is a full-time nursing student. Instead of moving back to New Jersey where her parents reside, Ms. Gaskill and her two children moved into a trailer park in Clarksville to be near a high school girlfriend. She found work

as a convenience store clerk on the evening and night shift and frequently left her children with male friends while she worked.

Ms. Gaskill resisted Mr. Gaskill's attempts to visit his daughter because she was concerned that Mr. Gaskill and his family would try to take the child back to Florida. Apart from one brief visit in February 1995, Mr. Gaskill did not see his daughter until July 1995 when the trial court granted him visitation in Florida for one month. Soon after picking up his daughter, Mr. Gaskill noticed that she was experiencing pain when she urinated. A pediatrician confirmed that the child was suffering from vaginitis and prescribed medication for the problem. According to Mr. Gaskill, the vaginitis was "90 percent gone" when he returned his daughter to her mother.

The child developed a case of head lice in August 1995 soon after she returned to Clarksville. Ms. Gaskill blamed the problem on Mr. Gaskill and claimed that her daughter returned from Florida "with a head full of lice." Mr. Gaskill insisted that his daughter did not have head lice while she was in Florida and stated that there were no reports of head lice among her Florida playmates. Ms. Gaskill obtained medicated shampoo for her daughter and stated at trial that she was treating her daughter's hair and bedding at least once a week "because the eggs or nits . . . can reinfest."

Mr. Gaskill had overnight visitation with his daughter two days before the divorce hearing. He learned at that time that she was again complaining about pain when she urinated and also noticed several suspicious bruises on her legs, arms, and abdomen. Dr. Quentin Humberd, a board-certified pediatrician, examined the child on the day before trial. He confirmed that her vaginal area was irritated and, when informed that she had been treated for vaginitis, stated that he would not have expected the condition to come back by itself. He attributed the reoccurrence of the infection to inappropriate bathing, lack of general cleansing or hygiene, or physical touching or fondling abuse.

Dr. Humberd also discovered that the child still had a moderate number of nits[1] in her hair. He testified at trial that he would not expect a child to still have nits after being treated with anti-lice shampoo for two months because the "treatment itself is very effective." He also explained that when one of his patients required treatment for head lice more than twice, he called the parents in for a talk with the clinic staff "because there is obviously a lapse in communication or treatment."

Dr. Humberd's examination also confirmed the existence of suspicious bruises on the child's legs. Based on their color, he estimated that they had been inflicted between two and five days before his examination. Their location and distribution also made him suspicious that they were not the result of normal childhood but rather were intentionally inflicted.[2] The child's condition was reported to the Department of Human Services as required by state law when Mr. Gaskill could not explain how his daughter had been bruised.[3]

Despite its concern about Ms. Gaskill's parenting skills, the trial court determined that Mr. Gaskill had failed to prove that Ms. Gaskill was an unfit parent. Accordingly, it awarded Ms. Gaskill custody and directed Mr. Gaskill to pay $220 per month in child support. The trial court requested the parties to work out a visitation plan but invited them to submit proposals if they were unable to agree. Accordingly, the October 13, 1995 divorce and custody order left the issue of visitation open. The trial court mailed the parties a letter on October 24, 1995

---

[1]Nits are head lice eggs attached to the hair shafts.

[2]Dr. Humberd testified in full as follows:

These bruises were in areas where we didn't usually expect to see them. There were bruises noted on the backs of the thighs, for example, and on the calves, on the top parts of the knees, which was a little unusual, and on the interior aspect of the arm, which is a place that a child would have a hard time running into something or falling into something.

[3]The Department of Human Services had not investigated this report since it was made only one day before the hearing. Thus, this record contains no administrative finding concerning Dr. Humberd's suspicion that the child had been physically abused.

containing its decision with regard to Mr. Gaskill's visitation rights, but an order embodying this decision was not entered until January 4, 1996.[4]

## II.

Divorce affects children profoundly by undermining their sense of stability and well-being. Thus, custody and visitation arrangements are among the most important decisions confronting a trial court in a divorce case. The needs of the children are paramount; while the desires of the parents are secondary. *Lentz v. Lentz,* 717 S.W.2d 876, 877 (Tenn. 1986). Custody should never be used to punish or reward the parents, *Turner v. Turner,* 919 S.W.2d 340, 346 (Tenn. Ct. App. 1995); *Long v. Long,* 488 S.W.2d 729, 733 (Tenn. Ct. App. 1972), but rather should promote children's best interests by placing them in an environment that will best serve their physical and emotional needs. *See Luke v. Luke,* 651 S.W.2d 219, 221 (Tenn. 1983).

No hard and fast rules exist for determining which custody and visitation arrangement will best serve a child's needs. *Taylor v. Taylor,* 849 S.W.2d 319, 327 (Tenn. 1993); *Dantzler v. Dantzler,* 665 S.W.2d 385, 387 (Tenn. Ct. App. 1983). The inquiry is factually driven and requires the courts to carefully weigh numerous considerations. *Nichols v. Nichols,* 792 S.W.2d 713, 716 (Tenn. 1990); *Rogero v. Pitt,* 759 S.W.2d 109, 112 (Tenn. 1988). Among these considerations are:

> the age, habits, mental and emotional make-up of the child and those parties competing for custody; the education and experience of those seeking to raise the child; their character and propensities as evidenced by their past conduct; the financial and physical circumstances available in the home of each party seeking

---

[4]Parties are entitled to an appeal as of right from final judgments. Tenn. R. App. P. 3(a). A final judgment is one that resolves all the claims between all the parties. *Aetna Casualty & Sur. Co. v. Miller,* 491 S.W.2d 85, 86 (Tenn. 1973); *Mengle Box Co. v. Lauderdale County,* 144 Tenn. 266, 276, 230 S.W. 963, 965-66 (1921). Neither the trial court's decision from the bench nor its October 13, 1995 order were final because they failed to resolve the parties' visitation dispute which was an integral part of the custody decision. *See Hester v. Hester,* 59 Tenn. App. 613, 621, 443 S.W.2d 28, 32 (1968). This dispute was not resolved until the entry of the January 4, 1996 order. Even though Mr. Gaskill's notice of appeal was premature, we will deem it timely in accordance with Tenn. R. App. P. 4(d).

custody and the special requirements of the child; the availability and extent of third-party support; the associations and influences to which the child is most likely to be exposed in the alternatives afforded, both positive and negative; and where is the greater likelihood of an environment for the child of love, warmth, stability, support, consistency, care and concern, and physical and spiritual nurture.

*Bah v. Bah,* 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983); *see also* Tenn. Code Ann. § 36-6-106 (Supp. 1995).

Courts customarily devise initial custody and visitation arrangements by engaging in a "comparative fitness" analysis which requires them to determine which of the available custodians is comparatively more fit than the other. *In re Parsons,* 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995); *Bah v. Bah,* 668 S.W.2d at 666. In undertaking this analysis, the courts must understand that parents, whether married or not, are human beings, each with his or her own virtues and vices. *Sherman v. Sherman,* App. No. 01-A-01-9304-CH-00188, slip op. at 9 (Tenn. Ct. App. Nov. 18, 1994) (No Tenn. R. App. P. 11 application filed). Therefore, the courts should not measure either parent against the standard of perfection. *Bah v. Bah,* 668 S.W.2d at 666; *Edwards v. Edwards,* 501 S.W.2d 283, 290-91 (Tenn. Ct. App. 1973).

Since stability is important to any child's well-being, the courts have emphasized the importance of continuity of placement in custody and visitation cases. *Taylor v. Taylor,* 849 S.W.2d at 328; *Contreras v. Ward,* 831 S.W.2d 288, 290 (Tenn. Ct. App. 1991). Continuity, however, does not trump all other considerations. Depending on the facts, a parent who has been a child's primary caregiver may not necessarily be comparatively more fit than the other parent to have permanent custody of the child.

Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these

matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law. *D v. K*, App. No. 03-A-01-9502-CH-00056, slip op. at 8-9 (Tenn. Ct. App. Sept. 29, 1995), *perm app. denied* (Tenn. Feb. 5, 1996). Thus, we review these decisions de novo on the record with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *Nichols v. Nichols,* 792 S.W.2d at 716; *Doles v. Doles*, 848 S.W.2d 656, 661 (Tenn. Ct. App. 1992).

### III.

We turn first to the manner in which the trial court employed the comparative fitness analysis. The comments from the bench indicate that the trial court only considered how the evidence reflected on Ms. Gaskill's fitness as a custodian but did not consider how the evidence reflected on Mr. Gaskill's fitness. Thus, the trial court did not compare the fitness of the two parties and then decide which parent, under all the circumstances, was comparatively more suited to have custody of their daughter.

The trial court appears to have placed the burden on Mr. Gaskill to prove that his wife was unfit to be their daughter's custodian. This is most clearly indicated by the trial court's assessment of Dr. Humberd's testimony as "not sufficient to cause this Court to believe that Mrs. Gaskill is unfit" and by its almost exclusive focus on Ms. Gaskill's parental performance.

A parent seeking custody is no longer required to prove that the other parent is unfit in order to be awarded custody. *Griffin v. Stone,* 834 S.W.2d 300, 305 (Tenn. Ct. App. 1992); *Harris v. Harris,* 832 S.W.2d 352, 353 (Tenn. Ct. App. 1992); *Bah v. Bah,* 668 S.W.2d at 667. Thus, the trial court's decision to focus almost exclusively on Ms. Gaskill's fitness was erroneous. In custody and visitation cases such as this one, the evidence should have been reviewed to determine both parties' fitness as a comparative matter. Thus, although the evidence may not have shown that Ms. Gaskill was an unfit mother, it may, and in this case does, indicate she is comparatively less fit than Mr. Gaskill to have

custody of the parties' daughter.  Because the trial court misapplied the comparative fitness analysis, we must now proceed with our own examination of the evidence giving due consideration to the trial court's findings of fact.

## IV.

Despite its repeated concerns about Ms. Gaskill's parenting skills, the trial court summed up its view of the evidence by commenting that "there was nothing [in the record] to indicate that Mrs. Gaskill has been a bad mother."  We do not agree with this conclusion because of the evidence concerning the child's suspicious bruises, her other recurring medical conditions, the environment in Ms. Gaskill's home, and Ms. Gaskill's veracity.  Having reviewed the record de novo, we have concluded that the record preponderates in favor of concluding that Mr. Gaskill, even with his short-comings, is comparatively more fit to be Briahna's custodian than Ms. Gaskill.

## A.
### THE CHILD'S SUSPICIOUS BRUISES

Two days before trial, Dr. Humberd discovered suspicious bruises on Briahna that did not appear to be caused by accidental injuries.  They prompted Dr. Humberd to submit a suspected abuse report to the Department of Human Services.  Neither Mr. Gaskill nor Ms. Gaskill could explain at trial how their daughter had been injured.  Mr. Gaskill's inability to explain the bruises is understandable since they could have only been sustained while the child was in Ms. Gaskill's custody.  Ms. Gaskill's inability to explain the bruises is more troubling.

The trial court did not attach proper significance to Dr. Humberd's testimony because it considered the evidence using the clear and convincing evidence standard. The trial court's choice of this heightened evidentiary standard was inappropriate because Mr. Gaskill was not attempting to terminate Ms.

Gaskill's parental rights.[5] This is a divorce proceeding, and Tenn. Code Ann. § 36-6-106(8) directs the courts to consider, among other factors, "[e]vidence of physical or emotional abuse to the child." Instead of requiring the trial court to first find that child abuse has occurred, it simply allows the court to consider evidence of abuse in devising a custody arrangement that will be in the child's best interests.

While we agree that Mr. Gaskill has not proved by clear and convincing evidence that Ms. Gaskill has abused Briahna, we find Dr. Humberd's testimony concerning the bruises quite helpful in comparing the parties' fitness. When asked about her daughter's bruises at trial, Ms. Gaskill stated that she had not noticed the bruises and that her daughter would have told her if she had been injured. Ms. Gaskill's testimony on this issue reflects either a desire to prevent the truth about her daughter's bruises from being discovered or an inattentiveness or neglect of her child's physical condition. Ms. Gaskill routinely entrusted her daughter's care to others while she was working and should have taken steps to ensure that she was not being mistreated. Her ignorance about her daughter's suspicious bruises reflects on her parenting skills and should not have been discounted.

## B.
### THE CHILD'S RECURRING MEDICAL PROBLEMS

A small child needs a custodian who will be attentive to his or her medical needs. The evidence in this case was that Briahna has suffered from recurrent vaginal infections and from recurrent head lice. Even though there is some disagreement concerning the cause of these conditions, we have concluded that the trial court erred in its consideration of these problems. The trial court simply stated that the evidence caused some concern about Ms. Gaskill's parenting skills but did not consider whether the evidence might have demonstrated that Ms.

---

[5]The trial court did not explain why it had chosen to weigh Dr. Humberd's testimony using the clear and convincing evidence standard. We can only assume that the trial court exported this standard from Tenn. Code Ann. § 37-1-147(d)(2) (1991) which permits the termination of parental rights upon the presentation of clear and convincing evidence that a parent has committed severe child abuse.

Gaskill was comparatively less fit to have custody of her daughter than Mr. Gaskill. Once again, the trial court failed to consider whether each parent's response to these problems demonstrated that Mr. Gaskill was a better custodian.

Mr. Gaskill demonstrated a proper parental response to his daughter's medical problems. When Briahna first complained of soreness while urinating, Mr. Gaskill examined her and then took her to a physician for treatment. He followed the physician's treatment recommendations and testified that his daughter's infection was ninety percent gone when he returned her to Ms. Gaskill in August 1995. The infection would have been completely cured had Ms. Gaskill continued treating her daughter and improved her person hygiene. However, the child still had a vaginal infection when Dr. Humberd examined her two months later. Dr. Humberd attributed the problem to inadequate bathing, lack of general cleansing, or physical touching or fondling abuse. Any of these causes reflects poorly on Ms. Gaskill's fitness to have custody of her daughter.

Ms. Gaskill made some effort to treat her daughter's head lice, but the problem still existed when Dr. Humberd examined the child two months later in October 1995. Dr. Humberd viewed the problem as an indication of a lapse in communication or treatment. Thus, the child's continuing problem with head lice also reflects on Ms. Gaskill's fitness to be her daughter's custodian.

The evidence of Ms. Gaskill's inadequate response to her daughter's health needs prompted the trial court to express concern about her parenting skills. The court's concern was assuaged by the way that Ms. Gaskill has cared for her son. Noting that the boy was a bright child in apparently good health, the trial court concluded that Ms. Gaskill's success in raising her son was proof that she would be equally successful in raising her daughter.

We do not dispute the trial court's observations with regard to Ms. Gaskill's son. It was certainly proper for the trial court to consider Ms. Gaskill's past treatment of her son in order to ascertain her future treatment of her daughter. However, Ms. Gaskill's relationship to her son should not overshadow her

demonstrated inability to attend to her daughter's hygiene and medical needs. When the responses of the two parents are compared, we find Mr. Gaskill's response to be more appropriate.

## C.

### THE CHILD'S HOME ENVIRONMENT

We now turn to the home environments offered by the parents. Ms. Gaskill and her children live in a three-bedroom trailer in Clarksville. Ms. Gaskill works until 10:30 or 11:00 every night as a convenience store clerk and thus must leave her children with various male friends and acquaintances because none of her family lives close by. Ms. Gaskill also smokes in the home even though her daughter has chronic asthma. In contrast, Mr. Gaskill lives in a condominium in Florida only three minutes away from his mother's home. He manages a Radio Shack store and has made arrangements for his mother to care for Briahna while he is working. Mr. Gaskill's extended family, including his aunts, uncles, cousins, and grandmother, also live close by.

Ms. Gaskill's current live-in boyfriend, Robert Kirk, and his aunt, Jean Bloch, frequently babysit Briahna while Ms. Gaskill is working. At the time of the hearing, Mr. Kirk himself was involved in a bitter divorce and custody battle.[6] His wife testified that Mr. Kirk had a bad temper and that on one occasion he had held his hands around his infant son's neck and had threatened to kill him.

Ms. Bloch babysits Briahna in her own home when she keeps the child. Many other persons are "coming and going" in Ms. Bloch's home, but Ms. Gaskill is not always aware of who these persons are. The risks associated with this environment were underscored by Briahna's complaints to her father than a man with blond hair who drove a yellow car had "rubbed her private parts." Ms. Gaskill did not know anyone fitting that description, but Mr. Gaskill later

---

[6]Ms. Gaskill was also pregnant with Mr. Kirk's child at the time of the divorce trial.

discovered that a person fitting that description had been living at Ms. Bloch's house and that Ms. Gaskill was unaware of this fact.

The evidence of this incident does not establish that the Gaskills' daughter was sexually abused while in Ms. Bloch's care. However, the incident demonstrates Ms. Gaskill's lack of attentiveness to her daughter's needs and her inability or unwillingness to provide appropriately safe and nurturing circumstances for her daughter. As a comparative matter, the evidence indicates that Mr. Gaskill will be able to provide his daughter with a more appropriate home environment than the one currently provided by Ms. Gaskill.

## D.

### MS. GASKILL'S VERACITY

Like the trial court, we have also noted serious lapses in Ms. Gaskill's truthfulness in testimony at the divorce hearing. The record contains several instances where Ms. Gaskill was forced to admit that she had lied about material items, such as her relationship with Mr. Kirk and her response to Mr. Gaskill's requests for visitation. Mr. Gaskill was also untruthful on at least one occasion; however, the extent of Ms. Gaskill's untruthfulness is troubling.

Trial courts are normally in the best position to judge the credibility of the witnesses since they have seen and heard the witnesses testify. *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995). Thus, a trial court's determination of credibility is entitled to great weight in this court. *Town of Alamo v. Forcum-James Co.*, 205 Tenn. 478, 483, 327 S.W.2d 47, 49 (1959); *Koch v. Koch*, 874 S.W.2d 571, 577 (Tenn. Ct. App. 1993). Consistent with the trial court's view of Ms. Gaskill's credibility, we note that she was untruthful when she insisted that Mr. Kirk, her current boyfriend, was not living with her in her trailer.[7]

---

[7]We also note that Mr. Gaskill stated that his girlfriend lives with him in his condominium. The fact that both Mr. Gaskill and Ms. Gaskill have chosen to live with their partners without the benefit of marriage reflects poor judgment on both their parts. It does not,

(continued...)

A parent's honesty reflects on his or her fitness to be a good custodian. In a prior case, we upheld an award of custody to a father where the evidence showed a consistent pattern of dishonesty and deception by the mother. *Carden v. Carden*, App. No. 01-A-01-9502-CH-00042, slip op. at 7 (Tenn. Ct. App. Nov. 22, 1995) (No Tenn. R. App. P. 11 application filed). The trial court in the *Carden* case noted that parents "lead by example" and that a parent who is "fundamentally dishonest" would not be a good example to his or her children. *Carden v. Carden, supra*, slip op. at 7. We concur with this observation and find that Ms. Gaskill's lack of credibility casts a shadow on her suitability as her daughter's custodian.

## E.

### BALANCING OF THE RELEVANT FACTORS

The record contains evidence concerning three factors that support Ms. Gaskill's request for custody of her daughter. The first is the child's age and gender; the second, the fact that Ms. Gaskill has been the child's primary caregiver since she was born; and third, the child's relationship with her siblings.

Briahna is only four years old. While there is no longer a presumption in Tennessee favoring maternal custody, Tenn. Code Ann. § 36-6-101(d) (Supp. 1995) permits the consideration of the gender of the parent and the child in custody determinations. Thus, to the extent appropriate, we have considered that Ms. Gaskill would be favored as custodian because Briahna is a four-year-old female child.

Tenn. Code Ann. § 36-6-106(2) requires the courts to consider which parent has been the child's primary caregiver. We do not disagree with the trial court's finding that Ms. Gaskill has been her daughter's primary caregiver and that Mr. Gaskill has also taken part in raising his daughter. We also note the trial court's concerns about Mr. Gaskill's financial contributions to his daughter's support

---

[7](...continued)
however, alter our comparative fitness analysis since both parties are engaging in the same conduct. Mr. Gaskill's request for custody would be enhanced either by marriage or by the relocation of his girlfriend.

during the time between separation and trial; however, we do not find that the level of his support, both financially and in-kind, indicate indifference or neglect toward his daughter.

We also note that granting Mr. Gaskill custody of his daughter will affect her relationship with her older half-brother and her younger sibling who had not yet been born by the time of trial. However, considering all the evidence, we have determined that the trial court erred by awarding custody of Briahna to Ms. Gaskill and that the evidence preponderates in favor of concluding that Mr. Gaskill is comparatively more fit to have custody of his daughter. Mr. Gaskill has demonstrated his ability and desire to attend to his daughter's needs and to provide her with a stable, nurturing home surrounded by her extended family. In contrast, Ms. Gaskill seems to have been either unwilling or unable to respond to her daughter's medical needs and has not provided her with a stable, nurturing environment.

## V.

We reverse the judgment awarding Ms. Gaskill custody of Briahna L. Gaskill and remand the case to the trial court for the entry of an order awarding custody to Mr. Gaskill, setting approriate visitation and child support for Ms. Gaskill, and for any other appropriate matter. We tax the costs of this appeal in equal proportions to Willa Jean Gaskill and Steven Wayne Gaskill and his surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:

_____
HENRY F. TODD, P.J., M.S.

_____

-14-

BEN H. CANTRELL, JUDGE