IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 17, 2018 Session

## FREDERICK JEROME BROWN, JR. v. ROXANA ISABEL BROWN

**Appeal from the Circuit Court for Hamilton County**
No. 15D1336      L. Marie Williams, Judge

————————————————————

**No. E2017-01348-COA-R3-CV**

————————————————————

In this divorce case, the trial court designated father, Frederick Jerome Brown, Jr., as the primary residential parent of the parties' only child. Mother, Roxana Isabel Brown, appeals. She argues that the trial court abused its discretion when it (1) designated father as the primary residential parent and (2) when it established a parenting plan that was not in the best interest of the child. We reverse the trial court's designation of father as the primary residential parent and remand the case for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed; Case Remanded for Further Proceedings**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which RICHARD H. DINKINS and THOMAS R. FRIERSON, II, JJ., joined.

Roxana Isabel Brown, Smyrna, Georgia, appellant, pro se.

Lucy C. Wright, Chattanooga, Tennessee, for the appellee, Frederick Jerome Brown, Jr..

**OPINION**

**I.**

Before the parties were married, but while they were engaged, father lived in Ooltewah, Tennessee, a suburb of Chattanooga. He worked – and continues to work – as an engineer for Tennessee Valley Authority at its Sequoyah Nuclear Plant in Chattanooga. In order to marry father, mother left her job at a Nashville law firm and moved to Ooltewah. Because mother was unable to secure employment as an attorney in Chattanooga, she eventually accepted a non-legal position with TVA.

The parties married on November 5, 2011, and shortly thereafter their relationship

rapidly deteriorated. The marriage was strained by personality conflicts, communication issues, an unfortunate miscarriage, and conflicting career goals. With respect to the latter, mother greatly desired a job that would allow her to utilize her legal training. Because of this desire, she wanted to expand her job search to the greater Atlanta area. Father, however, was unwilling to relocate because of geographical limitations imposed by his own job, *e.g.*, for six to eight weeks per year, father must be able to report to work within an hour's notice.

In July 2014, mother accepted an attorney position with the U.S. Department of Defense in Smyrna, Georgia, a suburb of Atlanta. Initially, mother planned to live in Ooltewah and commute to work (a 220-mile round trip). A week before she began her new job, however, mother discovered that she was pregnant with the child who is now at the center of this custody dispute. Because mother was concerned about the feasibility of the commute during her pregnancy, she signed a six-month lease for an apartment in Smyrna so she could live near her work pending the birth of the child. During those six months, mother lived in Smyrna and travelled back to Ooltewah on weekends.

On April 9, 2015, the child was born. Mother took four months of maternity leave and returned to Ooltewah. During this time, father had significant overtime. TVA scheduled a mandatory "refueling outage" that began on April 11, 2015 and lasted over a month.[1] During that outage, father worked night shifts, between ten and twelve hours per day, six days per week. At the conclusion of the refueling outage, in late May, father took about two weeks of paternity leave. However, on June 8, 2015, he volunteered for an optional assignment at Watts Bar Nuclear Plant in Spring City, Tennessee. This assignment frequently required father to work twelve hours a day (plus a two-hour commute), seven days per week from June 8, 2015 to August 11, 2015. During that period, father only had a few days off from work.

Over the course of this hectic summer, the parties were unable to reach an agreement about relocating closer to Smyrna. At this point, the parties' testimony of the facts diverges.[2] Mother says that she

> informed Father that she had signed a lease for an apartment

---

[1] Father testified that a refueling outage occurs when TVA refuels a reactor with uranium. These planned outages are scheduled once or twice per year. TVA records indicate that the subject outage was scheduled for April 11, 2015 to May 16, 2015; however, testimony at trial established that father's unit is required to work a few days prior to and after the official outage period. Mother testified that father had to work the day after the child was born.

[2] The trial court observed that "[t]he parties have conflicting memories on the history of the relocation. The Court does not find that history to be important to the resolution of any issue in this case . . . ." Later, the court observed that "neither party has greater credibility than the other . . . with the exception of the allegations of physical abuse. The Court finds the father more credible on this issue."

in Smyrna and secured a spot for the minor child at the Oxford Babies daycare. However, she also told father she would readily cancel her plans if the parties reached a resolution before she had to return to work. In late June, with no resolution in place and her maternity leave ending in less than a month, Mother informed Father that, if he still had no plan for their living situation, she would temporarily move to Smyrna with the minor child until the parties could move together to Dalton.

According to father,

Mother knew that Father did not want to relocate to Smyrna[,] Georgia because Father made this clear to her any time the topic was raised. However, Mother's solution to this was to move regardless, with the child, making all decisions unilaterally and not promptly informing the Father.

Due to the impasse, Father filed for divorce on July 2, 2015. Shortly thereafter, mother filed a motion requesting permission to relocate with the child to Smyrna. On July 27, 2015, the parties appeared before the trial court. The court ordered the parties to attend mediation. It established a short-term parenting plan (lasting only two weeks), which provided that the child would reside with mother, in Smyrna, from Sundays to Thursdays and with father, in Ooltewah, from Thursdays to Sundays.

On August 11, 2015, the court held a hearing to establish a temporary parenting plan. The next day, the court entered a temporary order providing that the child would reside with each parent on alternating weeks. The order also allowed each parent up to six hours of visitation during the weeks that the child was with the other parent. The parties subsequently submitted proposed permanent parenting plans. Father's proposed plan designated father as the primary residential parent and provided for the continuation of the alternating-week residential schedule. Mother's proposed plan designated mother as the primary residential parent and provided that the child would reside with mother 244 days per year and with father 121 days per year.

Trial was held over the course of three days – May 31, 2016, June 1, 2016, and December 14, 2016. On April 19, 2017, the trial court issued a memorandum opinion finding both parties at fault and declaring the parties to be divorced. This memorandum opinion was adopted and incorporated by reference in the court's May 31, 2017 final decree of divorce. In addition to settling other issues not relevant to this appeal, the court designated father as the primary residential parent. Instead of adopting father's proposed permanent parenting plan, however, the court adopted mother's proposed plan and "flipped" the residential schedule such that the child would reside with father 244 days

- 3 -

per year and with mother 121 days per year. Specifically, the court ordered that mother would only have responsibility for the child "every other week from Thursday at 7:00 p.m. until Sunday at 5:00 p.m. and in the alternating weeks from Thursday at 7:00 p.m. until Friday at 7:00 p.m." The plan also provided that "[w]hen [the child] begins pre-kindergarten, Mother shall parent every other week from Friday at 7:00 p.m. to Sunday at 5:00 p.m.[3]

## II.

Mother raises two issues on appeal:

> Whether the trial court abused its discretion in designating father as the primary residential parent; and

> Whether the trial court abused its discretion by establishing a parenting plan that is not in the best interest of the child.

## III.

Trial courts have broad discretion in matters relating to child custody. *See Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). Consequently, we will affirm the trial court's decision in this case absent evidence that the court abused its discretion. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). "[A] trial court abuses its discretion when it: appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Newberry v. Newberry*, No. E2017-00340-COA-R3-CV, 2018 WL 3058285, at * 3 (Tenn. Ct. App., filed Jun. 20, 2018) (quoting *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013)).

We recognize that a trial court's designation of a primary residential parent "often hinge[s] on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions." *Gaskill*, 936 S.W.2d at 631. Nevertheless, trial courts "still must base their decisions on the proof and upon the appropriate application of the applicable principles of law." *Id.* Similarly,

> [although] we are reluctant to second-guess a trial court's decisions regarding the adoption of a parenting plan, we will not hesitate to do so if we conclude that the trial court's decision is not supported by the evidence, that the trial court's decision rests on an error of law, or that the child's interests

---

[3] Additional details of the custody arrangement are discussed later in this opinion.

- 4 -

will be best served by another parenting arrangement.

*Massey-Holt*, 255 S.W.3d at 611.

In conducting our review, we presume that the trial court's findings of fact are correct unless evidence in the record preponderates otherwise. Tenn. R. App. P. 13(d). On the other hand, we consider questions of law de novo, with no presumption of correctness. **Burden v. Burden**, 250 S.W.3d 899, 904 (Tenn. Ct. App. 2007). "Nor does the presumption of correctness attach to 'the trial court's conclusions that are based on undisputed facts.' " **Id.** at 905 (quoting **Hall v. Houston**, No. M2002–01371–COA–R3–CV, 2003 WL 21688578, at *3 (Tenn. Ct. App., filed July 21, 2003)).

## IV.

### A.

In a final decree of divorce involving a minor child, a trial court must incorporate a permanent parenting plan in conformity with the provisions of Tenn. Code Ann. § 36-6-404 (2017). Among other things, the permanent parenting plan must include a "residential schedule" that designates a "primary residential parent," with whom the child will reside "more than fifty percent (50%) of the time." Tenn. Code Ann. §§ 36-6-402(4)-(5), -404(b). We first consider whether the trial court abused its discretion by designating father as the primary residential parent.

In a suit for divorce, all custody determinations "shall be made on the basis of the best interest of the child." Tenn. Code Ann. § 36-6-106(a) (2017). To that end, the statute instructs the trial court to "order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors." *Id.* Subsection (a) includes the following best interest factors:

> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;
>
> (2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining

the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical

surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a).

In analyzing the above factors, our courts do not hold each parent to the standard of perfection; instead, courts "must conduct a 'comparative fitness' analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other." ***Chaffin v. Ellis***, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006) (citing ***Bah v. Bah***, 668 S.W.2d 663, 666 (Tenn.1983)).

In this case, the trial court emphasized that "[t]his child needs additional stability." The court also expressly considered the statutory best interest factors and made findings of fact with respect to each. The court concluded that only two factors weighed in favor of one parent over the other. Specifically, the court held that factor (9) favored mother and that factor (2) favored father. Ultimately, the trial court gave greater weight to factor (2) and therefore designated father as the primary residential parent.

Mother argues that the evidence in the record preponderates against the trial court's finding that factor (2) favored father and that factors (1), (5), and (14) favored

neither parent. In addition, mother argues that the trial court erred by failing to give any weight to factor (9), which the court found to favor mother. We address each of these best interest factors in turn.

**1.**

Best interest factor (2) directs the court to consider "each parent's . . . past and future performance of parenting responsibilities, including the willingness and ability of each of the parents . . . to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents . . . ." Tenn. Code Ann. § 36-6-106(a)(2).[4] In 2012, the General Assembly amended this portion of the statute by adding the following language:

> In determining the willingness of each of the parents . . . to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent . . . to honor and facilitate court-ordered parenting arrangements and rights, and the court shall further consider any history of either parent . . . denying parenting time to either parent in violation of a court order.

Tenn. Code Ann. § 36-6-106(a)(2).

Here, the trial court determined that factor (2) weighed in favor of father and was ultimately dispositive. With respect to the first part of factor (2), the court found that "Mrs. Brown is an excellent Mother and Mr. Brown is an excellent Father. Both have the potential for future performance of parenting responsibility." However, the court expressed doubts about mother's willingness to facilitate and encourage a good relationship between the child and father:

> In the earlier hearings, the Mother was extremely critical of and dismissive of the Father. She essentially had nothing good to say about him and his ability to parent. By the time of the final hearing, she had softened her attitude and articulated an understanding of the need of the child to have a good relationship with both parents. The Court would like to believe this is because she had come to understand that it is essential to the child's well being . . . . However, the Court fully understands her change may have been a result of enlightenment on the statutory factors for consideration by

---

[4] Before 2014, factor (2) was enumerated factor (10). Therefore, for the sake of uniformity, we will use brackets henceforth to designate the present numbering found in Tenn. Code Ann. § 36-6-106.

the Court in reaching a parenting plan.

Later, the court stated the following:

> There has been an increased willingness and ability of the parents to facilitate and encourage a close and continuing parent/child relationship between the child and both of the child's parents. Mr. Brown has been consistent throughout in his articulation of the need for the child to have a close relationship with the Mother. At trial, the Mother stated a consistent view. Perhaps most persuasive of the progress these parties have made is the communication permitted between each parent and the child while with the other parent by Tango. There have been continuing and daily video interactions between the child and the parent with whom he is not physically present. The attitudes testified to by the parents are in stark contrast to the relationship revealed in emails, texts, and social media generally.

Here, the trial court was referring to thirteen text messages and four emails that mother sent father between August 2015 and December 2015. According to the court, these emails show that "Mother has quite the temper and ability to be very derogatory of the Father." Our review of this evidence confirms that mother repeatedly used language intended to insult father's intelligence and to impugn his parenting abilities. For example, mother called father an "idiot" four times and twice used an expletive to describe what type of father she believed him to be.

The trial court concluded that "Mother is less willing to foster the requisite relationship between the child and the Father but the Court hopes this can be cured." Based on the quoted material above, we presume that the trial court based this conclusion on its observation of mother's courtroom demeanor, the handful of text messages and emails exchanged between the parties in the early months of the divorce, and the court's speculation about the reason for mother's improved attitude.

Mother first argues that the trial court's heavy reliance on her demeanor at the August 2015 hearing was "misplaced." Mother says that her critical words at this hearing "stemmed from the unrefuted fact that [father] had been minimally involved with the minor child [in the months immediately after the child's birth] due to his hectic work schedule."

Second, mother admits that some of her text messages and emails to father were inappropriate; however, mother argues that these private communications have little to no probative value to the factor (2) analysis. Mother points out that the name-calling did not

occur in the presence of the child. In addition, none of the messages threatened to interfere with father's co-parenting or visitation time. Finally, the messages were sent in the early stages of the divorce and father conceded at trial that communication since then "has been pretty good."

Third, mother argues that evidence in the record preponderates in favor of an alternate finding that she was willing to facilitate and encourage the child's relationship with both parents. Specifically, mother claims that father failed to refute any of the following evidence:

> On more than one occasion, Mother offered Father the opportunity to visit with the child privately in her home when Father expressed that he did not have anywhere in the Atlanta area to exercise his six-hour visitation with the child;
>
> Mother agreed for Father to visit with the child on several Saturdays – despite the Temporary Order prohibiting visits on that day – due to the fact Father had not been able to exercise his visits on his Fridays off.
>
> Mother encouraged Father to take advantage of the six-hour visits with the child after Father failed to do so between September and November 2015.
>
> Mother, who always exercised her six-hour visits with the child on Thursdays, reschedule[d] her visit to a different day [one] week so that Father could spend his birthday with the child;
>
> During Father's November 2015 outage, Mother voluntarily gave Father four more nights during each of his parenting weeks than the Temporary Order required;
>
> Mother always attempted to schedule the child's routine medical appointments in order to allow maximum participation from Father, notified Father of all such appointments, and informed Father of any issues immediately after each appointment Father did not attend; and
>
> Like Father, Mother routinely sent Father pictures and videos of the minor child and allowed him to Tango with the child daily.

We do not question the trial court's finding that mother was "extremely critical of and dismissive of the Father" at the August 2015 hearing, regardless of whether her hostility was justified. The trial court is in the best position to assess the demeanor of witnesses and such a determination is relevant in child custody disputes. *Gaskill*, 936 S.W.2d at 631. For the same reason, we do not disturb the court's finding that "[b]y the time of the final hearing, [mother] had softened her attitude and articulated an understanding of the need of the child to have a good relationship with both parents." In our view, this latter finding greatly dilutes the significance of the former finding.

The text messages and emails speak for themselves and we are not required to presume the correctness of "conclusions that are based on undisputed facts." *See Burden*, 250 S.W.3d at 905 (quoting *Hall v. Houston*, No. M2002–01371–COA–R3–CV, 2003 WL 21688578, at *3 (Tenn. Ct. App., filed July 21, 2003)). However, we agree with mother that these communications have little to no probative value in the factor (2) analysis. It is common for divorcing parents to harbor animosity toward one another, especially in the early stages of the divorce. It is also common for divorcing parents to be uncivil in their communications with one another. By containing their incivility to private, written messages inaccessible to their infant child, mother and father sheltered the child from the brunt of the verbal attacks.

Father points to *Nunnally v. Nunnally* as an example of this Court considering private communications between parents in a best interest analysis. No. E2016-01414-COA-R3-CV, 2017 WL 1536084 (Tenn. Ct. App., filed Mar. 1, 2017). However, mother correctly observes that the text messages in *Nunnally* were primarily offered as evidence of the mother's mental illness, which the mother denied she had. *See id.* at *6. Also, one of the mother's text messages in that case actually threatened interference with the father's co-parenting rights. *See id.* at *2. In our case, father did not introduce the text messages and emails in order to prove a fact independent of the name-calling itself; neither does father contend that mother threatened interference with his parenting rights. Accordingly, *Nunnally* is not controlling in this matter.

Putting aside the text messages and emails, we are left only with the trial court's speculation about the reason for mother's improved behavior and the possibility of future bad conduct. Although a trial court has extensive discretion in determining which parent is more likely to facilitate and encourage a good relationship between the child and both parents, the court's decision must be guided by the language of the statute. As previously discussed, the child custody statute specifically instructs courts to "consider the likelihood of each parent . . . to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider *any history of either parent . . . denying parenting time to either parent in violation of a court order*." Tenn. Code Ann. § 36-6-106(a)(2) (emphasis added).

In *Burden v. Burden*, before the statute was even amended to include the

- 11 -

aforementioned language, we emphasized the importance of considering a parent's compliance with court-ordered parenting arrangements. 250 S.W.3d 899, 910 (Tenn. Ct. App. 2007). Specifically, we rejected a trial court's mere speculation that the father's "parenting [would be] over" if the court were to adopt the mother's proposed parenting plan, because there was

> no evidentiary basis for the court's implicit prediction that [mother] would interfere so drastically as to blatantly defy her own proposed parenting plan . . . . There is certainly no need to strike preemptively against the possibility of such defiance, *especially given that there is nothing in the record suggesting that [mother] has a history of violating court orders or otherwise interfering with Husband's rights to the extreme degree contemplated by the language of the opinion.*

*Id.* (emphasis added).

As in **Burden**, "there is nothing in the record suggesting that [mother] has a history of violating court orders or otherwise interfering with [father's] rights . . . ." To the contrary, father conceded and the trial court found that mother allowed the child to video chat with father on a daily basis while the child was in her care. In addition, the only apparent violation of a court order occurred when mother allowed father to visit the child on some Saturdays, which the temporary parenting plan prohibited. Mother also testified, without contradiction, to numerous other instances in which she accommodated and facilitated father's co-parenting time. *See supra*. These undisputed facts suggest that the trial court's speculative finding was contrary to the great weight of the evidence.

To summarize, we hold that the court erred by overemphasizing the petty insults that mother directed at father in private communications during the early stages of the divorce. The content of those messages is not probative of mother's willingness to facilitate and encourage a good relationship between the child and father. Although we respect the trial court's finding with respect to mother's demeanor in the August 2015 hearing, that finding is diluted by the court's admission that mother significantly improved her attitude by the time of trial. The court erred by presuming that mother would seek to undermine the child's relationship with father absent any evidence that mother had previously interfered with their relationship or threatened to do so in the future. All evidence in the record preponderates in favor of the opposite conclusion – that mother took affirmative steps to facilitate and encourage the child's relationship with father. To conclude otherwise would be to "resolve[] the case on a clearly erroneous assessment of the evidence," which constitutes an abuse of discretion. **Newberry**, 2018 WL 3058285, at * 3.

At the same time, we find no evidence in the record that suggests father is unlikely

to facilitate and encourage a good relationship between the child and mother. To the contrary, we credit the trial court's finding that father "has been consistent throughout in his articulation of the need for the child to have a close relationship with the Mother." Although father sometimes sent text messages to mother that were critical of her parenting, we do not find these messages relevant to the factor (2) analysis for the same reason that we do not find mother's messages relevant. Instead, we find it more significant that father, like mother, sent mother photos of the child and allowed the child to video chat with mother on a daily basis while the child was in his care. There is no evidence that father ever interfered or threatened to interfere with mother's visitation or co-parenting time. Accordingly, we conclude that factor (2) favors neither party.[5]

### 2.

Best interest factors (1) and (5) require the court to consider the extent of each party's parenting involvement prior to the divorce. Specifically, the court must consider:

> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the *majority* of parenting responsibilities relating to the daily needs of the child; [and]
>
> (5) The degree to which a parent has been the *primary caregiver*, defined as the parent who has taken the *greater* responsibility for performing parental responsibilities.

Tenn. Code Ann. § 36-6-106(a)(1), (5) (emphasis added).

With respect to factor (1), the trial court stated:

> Both parties are able to and have attended to the parenting responsibilities and daily needs of the child. Because of the bitter and aggressive denial of Mr. Brown's ability to care for the child during early hearings in this matter, the Court determined it appropriate to let actual experience with parenting by Mr. Brown take place and be put into evidence as opposed to the fears and concerns of Mrs. Brown. He has proven himself more than capable of being an outstanding Father. During the Mother's maternity leave, she and her Mother took over the care of the child. The Father was working a mandatory outage at TVA. As not uncommon with

---

[5] Because we find that factor (2) does not favor father, we do not address mother's contention that the trial court erred by basing its decision solely on this factor.

new parents, they hold different views of reality.  Mrs. Brown dismissed Father's involvement as minimal.  Mr. Brown felt pushed out and excluded from [the child's] care.

Later, with respect to factor (5), the court stated:

Neither party has been the primary caregiver.  Since the Mother left Chattanooga, the parents have shared the time with the child substantially equally and each has had full responsibility for his care when with that parent.

Mother asserts two reasons that the trial court erred in determining that factors (1) and (5) did not favor either parent.  First, mother argues that the trial court significantly downplayed her role as the primary caregiver from the time of the child's birth on April 9, 2015, until the temporary parenting plan took effect on August 12, 2015.  Second, mother claims that even though the temporary parenting plan required the parties to co-parent on alternating weeks, mother still performed more parenting responsibilities than father during the pendency of the case.

In its memorandum opinion, the trial court acknowledged that mother "took over the care of the child" during her maternity leave.[6]  This seems to be an explicit finding, or at least an implicit finding, that mother was the primary caregiver *during that time*.  The evidence preponderates in favor of such a finding.  As previously discussed in this opinion, father began working extended hours the day after the child was born during a mandatory refueling outage.  Although father was eventually able to take two weeks of paternity leave, he then volunteered for an optional work assignment that required him to work seven days per week for two months with little time off.  Nevertheless, we agree with the trial court's implicit conclusion that mother's care for the child during these early months does not, by itself, make mother the primary caregiver.  Mother concedes as much in her brief.

Still, mother's parenting during her maternity leave is certainly relevant to determining which parent was responsible for the "*majority* of parenting responsibilities relating to the daily needs of the child," and which parent took "*greater* responsibility for performing parental responsibilities."  Tenn. Code Ann. § 36-6-106(a)(1), (5).  The trial court erred by only considering the parties' division of parenting responsibilities since the temporary parenting plan took effect; the court should have taken a more holistic approach.[7]  For example, in ***Cummings v. Cummings***, we held that "the evidence clearly

_____

[6] Earlier, in the court's August 12, 2015 order, the court stated that "Mother assumed the majority of the responsibility for the child immediately after his birth . . . ."

[7] Even if the trial court was correct to limit its analysis to the time that the parents were co-

established that the mother was [the child's] primary caregiver" even though the parties co-parented on an alternating-week basis during the pendency of the divorce. No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *9 (Tenn. Ct. App., filed Oct. 15, 2004). In so holding, we emphasized that mother "was overwhelmingly responsible for the daily needs of the child up until the trial court established the alternating week custody schedule."[8] *Id.*

In the present case, twenty-four months elapsed from the time the child was born until the trial court issued its memorandum opinion. The trial court acknowledged that mother was the primary caregiver for the first four months of the child's life. For the next twenty months, the parties co-parented on an alternating-week basis. Thus, assuming each parent fully maximized their allotted co-parenting time, each parent would have been responsible for ten months of parenting under the temporary parenting plan. In total, mother would have been primarily responsible for the child for fourteen of the twenty-four months, or fifty-eight percent (58%) of the time. Father would have been primarily responsible for the child for ten of the twenty-four months, or forty-two percent (42%) of the time.

Moreover, mother claims that father did not fully maximize his co-parenting time under the temporary parenting plan. The evidence in the record supports her assertion. On the first day of trial, father testified that in the ten months since the temporary parenting plan took effect, he left the child at daycare or with third parties thirteen times on days that he was not scheduled to work. Father testified that he was called in to work on eight of these days; he used the other five days for personal errands (e.g., shopping, vehicle maintenance, attending to a family emergency, etc.). In addition, although each parent had the right to exercise up to six hours of visitation during their non-parenting weeks, father testified that he only used "about half" of his allowed visits. In contrast, both parties testified that mother never missed a visit during her non-parenting weeks. Mother was also never required to work on her scheduled days off.

We conclude that the trial court abused its discretion in finding that neither party

---

parenting on alternating weeks, we question whether it was appropriate for the court to couch its holding in terms of each parent spending "substantially equal[]" time with the child. Tenn. Code Ann. § 36-6-106 does not contain the phrase "substantially equal." That language previously appeared in the relocation statute codified at Tenn. Code Ann. § 36-6-108(c), (d)(1) (2016) (amended 2018). The trial court correctly emphasized in its memorandum opinion that this is not a relocation case and should be analyzed under Tenn. Code Ann. § 36-6-106. Even if the substantially equal test were to apply here, for reasons discussed later in this opinion, we would hold that mother parented the child substantially more than father.

[8] We recognize that the parties in **Cummings** operated under the alternating-week residential schedule for less time than the parties in this case. However, **Cummings** still demonstrates that courts must take a holistic approach to determining which parent has performed the majority of parenting responsibilities. Arbitrary line-drawing is not permitted.

performed the "majority of parenting responsibilities relating to the daily needs of the child" and that neither party was the "primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities." The record clearly shows that mother was the primary caregiver in the first four months of the child's life and that mother performed more parenting responsibilities than father under the temporary parenting plan. Therefore, factors (1) and (5) both favor mother.

**3.**

Best interest factor (14) requires the court to consider "[e]ach parent's employment schedule, and the court may make accommodations consistent with those schedules." The trial court concluded that this factor did not favor either parent. Specifically, the court found that

> [t]he employment schedule of each parent[] is substantial but both employers are flexible. There is the factor of outage time which the Father must work. These normally are scheduled but sometimes are not. The Court has no doubt that the Mother would be more than happy to step in in the event an outage takes place and appropriate day care could not be located for the child. She and her family have testified that the extended family would assist as needed in the child's care.

Mother argues that the trial court erred in finding that father's work schedule was "flexible" and that mother's work schedule was "substantial." We do not think it is helpful to discuss whether each parent's work schedule is "substantial" and/or "flexible" in the abstract. Instead, we reframe the issue in a way that is more consistent with a traditional comparative fitness analysis: Which parent's work schedule is *better suited* to serve the best interest of the child? *See **Chaffin***, 211 S.W.3d at 286 ("In choosing which parent to designate as the primary residential parent for the child, the court must conduct a 'comparative fitness' analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other.").

We begin our analysis of this factor by summarizing the parties' respective work schedules. Father testified that since the end of August 2015, his standard schedule has been Monday through Thursday, ten hours per day, from 7:00 a.m. until "around" 5:15 p.m. However, father is also required to work extended hours during planned "refueling outages" as well as unplanned "forced outages." TVA schedules "refueling outages" once or twice per year. Father testified that during these outages, which last about one month, he must work six days per week – ten hours per day Monday through Friday and twelve hours on Saturday. On the other hand, "forced outages" occur whenever there is an unexpected maintenance issue that requires the plant to shut down. Father testified

that forced outages are completely unpredictable and have lasted for as little as two days and, in "rare" cases, as many as fifty days. Because of the possibility of these forced outages, father could be called in to work at any time. In addition to working outages, father must also report to work whenever an issue arises that requires his expertise in thermography, vibration analysis, or oil analysis. Father testified that only four other employees at TVA possess comparable expertise in those fields. Finally, for six to eight weeks per year, father must be "on call," such that he can report to work within an hour's notice in the event of an emergency at the plant.

Father offered limited evidence of his schedule's flexibility. First, father testified that TVA altered his schedule after the birth of the child. Specifically, TVA changed his standard schedule from working five eight-hour days to working four ten-hour days. In addition, during refueling outages, TVA allowed father to move from night shift to day shift and allowed him to work five ten-hour days and only one twelve-hour day instead of six twelve-hour days. Father also testified that his employer "understands" his family situation and is "lenient" about father arriving late to work when he has to drop the child off at daycare.

Mother is required to work forty hours per week. Her standard schedule is Monday through Friday, eight hours per day, from 8:00 a.m. to 4:30 p.m. However, mother is allowed to arrive at work any time between 6:00 a.m. and 8:30 a.m. and can leave any time between 2:30 p.m. and 5:00 p.m. provided that she works eighty hours per two-week pay period. Mother testified that her employer also allows her to work from home up to two days per week. She is never required to work during non-working hours. Mother also testified that during the pendency of this case her employer has allowed her to change her schedule in order to accommodate mother's desire to exercise her six hours of visitation with the child during non-parenting weeks.

The evidence plainly shows that mother's work schedule would provide the most stability for the child and would minimize the number of hours the child is in the care of third parties. Mother's employer allows her to work from home up to two days per week and mother testified that she would take advantage of that opportunity if awarded primary custody. Furthermore, mother's employer never requires her to work during non-working hours. In contrast, father must work extended hours during planned outages, which last about one month. Father can also be called in to work at any time during a forced outage or to help with an issue that requires his expertise. Father testified that this occurred on eight different occasions during his parenting weeks with the child between August 11, 2015, and May 31, 2016.[9] When father works overtime, he must leave the

---

[9] As the trial progressed, mother introduced additional evidence showing that between June 1, 2016, and November 2, 2016, father dropped the child off at daycare on seven additional Fridays. Because TVA refused to provide additional timesheets and because neither party testified about those occasions, it is unclear whether father was working on those particular days.

- 17 -

child at daycare, arrange for a babysitter, or leave the child with mother.

Father argues that the court-ordered permanent parenting plan "cured" the challenges presented by his work schedule because the plan provides that the child will reside with mother during scheduled refueling outages, except for Sundays from 10:00 a.m. to 6:00 p.m. In addition, the plan gives mother the first option to parent the child if father is unable to parent the child for more than twenty-four hours during his scheduled parenting time.

Mother correctly observes that these accommodations do not eliminate the unpredictability inherent in father's job. Father can still be called in to work at any time because of a forced outage or because of his expertise in certain fields. During these times, the child's daily schedule will be disrupted and a third party will have to care for him. Mother also argues that this would happen more frequently if father was given primary custody. She points to father's testimony that forced outages had not had drastically impacted his parenting time "because you never know if it could be happening on a week that I don't have [the child]." Father similarly stated: "I have to work a few times, but usually when I have to work on Friday or if I, you know – if I'm needed, I try to go in on the Friday I don't have [the child]." Obviously, as the primary residential parent, father would not have the luxury of relying on his non-parenting weeks to work overtime.

Clearly, mother's work schedule is better suited to furthering the best interest of the child, with or without the trial court's crafted accommodations. The trial court abused its discretion by concluding that factor (14) favored neither party.

**4.**

Best interest factor (9) requires the court to consider "[t]he child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities." Tenn. Code Ann. § 36-6-106(a)(9). With respect to this factor, the trial court found that

> [t]here are no siblings or half-siblings in either home, although [the child] does have a half-sister on his Father's side with whom he has some contact. She is substantially older than he is. The child has relationships with his maternal grandparents and aunt and uncle and those relationships are stronger than those with the Father's family. He is in satisfactory physical surroundings and day care in both locations.

Because the trial court found that the child had "stronger" relationships with his mother's family than his father's family, it appears that the trial court concluded that factor (9) favored mother. Mother argues that the court erred by failing to give this factor any weight.

It is unclear whether father disputes the trial court's finding that factor (9) favored mother.[10] In any event, the evidence clearly preponderates in favor of the trial court's determination that factor (9) favored mother. The child has clearly bonded with his maternal relatives in Atlanta more than he has with father's family.

Contrary to mother's assertion that the trial court failed to give factor (9) "any weight," father argues that the court carefully considered factor (9) in its analysis. Specifically, father observes that the trial court adopted the permanent parenting plan with the understanding that mother's family in Atlanta would be able to help mother care for the child during the weeks that father is required to work outages.

The question of how much *weight* the trial court initially gave to this factor has become moot in light of our determination that factors (1), (5), and (14) favor mother and that factor (2) favors neither party. A proper balancing of all factors leads to the conclusion that mother should have been designated as the primary residential parent.

**B.**

As a consequence of our holding that mother should be the primary residential parent, we conclude that the court-ordered permanent parenting plan is not in the best interest of the child. Therefore, we remand this case to the trial court for the purpose of establishing a new permanent parenting plan that is consistent with our determination that mother should be the primary residential parent.

**V.**

The judgment of the trial court designating father as the child's primary residential parent is hereby reversed. We remand the case to the trial court for the purpose of

---

[10] Father simply states that it is "disingenuous" for mother to say that her parents, who live in Huntsville, Alabama, are better situated than father's parents, who reside in Birmingham, Alabama. This argument, however, completely ignores the fact that child's maternal uncle, aunt, and cousin reside in Atlanta and visit with the child on a regular basis. Father also draws our attention to a text message in which mother called him a "s***** father" for driving the child to see his paternal grandparents in Birmingham. It is unclear what relevance this has to the factor (9) analysis. Regardless, father drastically takes this message out of context; one of mother's subsequent text messages clarified that she was criticizing father's decision to "to drive [the child] almost two hours away on the interstate, just to turn right back around in two hours."

- 19 -

establishing a new permanent parenting plan that is consistent with this opinion.  Costs on appeal are taxed against the appellee, Frederick Brown.

_____
CHARLES D. SUSANO, JR., JUDGE